**Lewgene HALL, Appellant,**

v.

**HERCULES, INCORPORATED, Appellee.**

**No. 73–1421.**

United States Court of Appeals, Tenth Circuit.

April 1, 1974.

Robert C. Londerholm of Hackler, Londerholm, Speer, Vader & Austin, Olathe, Kan., for appellant.

Leonard O. Thomas and David K. Fromme of Weeks, Thomas, Lysaught, Bingham & Mustain, Kansas City, Kan., for appellee.

Before LEWIS, Chief Judge, and HOLLOWAY and McWILLIAMS, Circuit Judges.

LEWIS, Chief Judge.

This appeal follows an order of the District Court for the District of Kansas granting Hercules' motion for judgment notwithstanding the verdict, preceded by a motion for a directed verdict taken under advisement by the court, setting aside a jury verdict of $20,000 awarded in Hall's action for slander. Hall was discharged from employment in maintenance at the Sunflower Army Or-

dinance Plant,[1] near Kansas City, as the aftermath of an anonymous telephonic bomb threat received at the Plant on February 4, 1970. The trial court determined as a matter of Kansas law that the evidence did not support the verdict.

On the indicated date, a trunk call was received by a telephone operator at the Plant, the male caller asking to be connected with Extension 5760 (the maintenance supervisor). There being no answer the caller than asked for Extension 5633 (the electrical department). Again, there was no answer and the operator asked if she could call the motor pool to try to locate the requested supervisors. The caller answered, "No, I have to get in touch with someone quickly, there is a bomb planted out there set to go off in thirty minutes." The operator asked him to repeat the statement and after doing so, the caller hung up. The incident was immediately reported to the Commanding Officer, the disaster siren was sounded and the Plant was evacuated. No bomb exploded nor was any bomb found by search. After a work stoppage of an hour and ten minutes the all-clear signal was given. Employees were made aware of the cause of alarm.

Hercules then began a determined investigation. Reasoning that the caller showed some familiarity with the Plant because of his use of specific extension numbers and the fact that the call originated outside the Plant, Hercules directed its attention to employees who were not working on the February 4th shift. The maintenance shift supervisor, when asked whether he had such an employee whom he thought potentially capable of making such a call, named plaintiff. A review of Hall's personal and medical records indicated plaintiff to be an unusual employee.[2]

1. Operated by Hercules as a subsidiary making rocket fuel.

2. We do not think it necessary to detail all of Hall's extra-curricular activities during his period of employment. He had been earlier helpful to the company in an employee theft matter, was currently aggressive in a drug

On February 5, an investigator, Atkinson, telephoned Hall at his home and engaged him in a conversation concerning "drug abuse" at the Plant. The telephone operator listened to the conversation on an extension and at its conclusion stated that Hall's voice was very similar to that of the anonymous caller and contained the same tone and enunciation.

On February 6, Hall reported to the Plant medical office for a release to return to work. He was examined by the company doctor and then told to sit in the waiting room. Other employees were in the room. Soon thereafter Atkinson came to the waiting room and asked Hall to come with him to the main security office. The two discussed "drug usage" at the Plant with apparently no mention of the bomb threat being made. Hall was then asked to return to the medical waiting room. Soon thereafter Atkinson again asked Hall to come with him, this time to the administrative offices where he was directly interrogated by an F.B.I. agent concerning the bomb threat. Hall denied any knowledge of or participation in the incident and returned to the waiting room. Still later and in response to a telephonic request Hall returned to the administrative offices for a third interview. High-level plant authorities, after accusing Hall of having made the bomb threat, discharged him for that reason and other reasons pertaining to his work record. Hall's first and principal appellate contention is that the defendant's "reckless" conduct in thrice having him taken, in the view of casual employees, from the waiting room to other company offices constituted a nonprivileged publication of a grave slander.

■■ There can be no dispute that the evidence is sufficient to present a

matter and currently annoyed because his wife, also a Hercules' employee, was working a shift different than his. He had an earlier record of personal emotional problems and had a history of making demanding and annoying telephone calls to plant officials. On February 4th he was off work because of a skin infection.

jury question upon two of the basic requirements for a compensable action for slander, the accusation of the commission of a crime and the falsity of the accusation. Nor should there be any doubt that Hercules, suddenly faced with a situation so inherently dangerous as a bomb threat directed to the destruction of a factory manufacturing explosives and the safety of thousands of employees, had a legal right to immediately initiate and pursue a rigorous investigation of the occasion. And the extent of that right must be measured by the atmosphere of the situation, not created by Hercules, which necessarily included plant-wide notoriety, anxiety and concern at all levels of plant employment. Such right includes the privilege of interrogation of employees, even chosen at random, in an effort to develop investigative leads and it would be totally unrealistic to require the fact of such interrogation, to be kept secret. The privilege of interrogation, concomitant to the right, must be broad enough to be meaningful. We hold, therefore, that each interrogation of Hall was privileged and that the particular conduct of Hercules in calling Hall to the place of interrogation, although the fact of interrogation might thus be speculatively revealed to casual employees, was well within the privilege. It follows that Hercules did not actionably publish, by conduct, the claimed slander through its acts in this aspect of the case.

■ With some qualification not here pertinent, the defense of a privileged publication in a slander suit is abrogated if the publication is motivated by malice in law or fact. We here speak in generalities for under our view of this diversity case it is not necessary to define "malice" with particularity nor to elaborate on the quality or quantity of evidence necessary to prove malice, however it may be defined under widely divergent treatises in state law. The trial court in granting the motion for judgment notwithstanding the verdict, and with full recognition that the existence of malice was ordinarily a question for the jury, held:

[A]ll the evidence indicates that Hercules treated Hall in a dignified and seemly manner on February 6th, and there was no evidence of any outrageous conduct toward Hall which was intended to injure or humiliate him in any manner. There simply was no evidence of "actual evil-mindedness", or actual malice, in fact or law, on the part of the defendant Hercules.

After careful consideration of the total record we agree with the conclusion of the trial court. Hall in fact testified that he, subjectively, did not believe his predicament was occasioned by personal ill will or spite directed against him.

Two further complexities exist in the case which require our determination, each one involving an incident which we consider to be beyond the permissible scope of the defense of privileged communication and publication.

■ Hall testified that while he was seated in the medical waiting room, with other employees present, five supervisory employees passed through the room and that one such employee glanced at him and stated, "There he is." The second incident occurred after Hall's discharge. The defendant directed that Hall's tools be gathered and delivered to him rather than allowing Hall to do this himself, a deviation from normal Plant procedure. Hall contends that these incidents pinpointed him within the sight, hearing, or presence of nonprivileged employees and thus tainted him with the inference of published guilt.

No witness was called by plaintiff who saw, heard, or was present at the occurrence of such incidents although admittedly other employees could have been, and in the waiting room were, exposed to the event. Plaintiff cites numerous cases from states other than Kansas to the effect that it is within the province of the jury to infer, without specific proof, that a person physically present within view or hearing of such

an incident did see, hear, understand and draw a subjective conclusion on the subject. The law of Kansas would appear to be otherwise although that Court has not directly passed upon the question.

In Stidham v. State Bank, 126 Kan. 336, 268 P. 106, 108, by way of dictum the Kansas Supreme Court stated:

> If the case were on trial, it would be necessary for the plaintiff to prove, not only that the statements were made, but that they were made to, or in the presence of, third persons; it would be necessary to produce a witness who had heard those statements made.

So, too, in Batten v. Cox, 118 Kan. 78, 233 P. 1040, the Kansas court in considering the sufficiency of a complaint alleging only that slanderous words were spoken in the presence of a young girl but not alleging that the girl heard or understood the words upheld the sufficiency of the complaint. The court indicated its reasoning:

> Those parts of the petition which alleged that the words were published constituted an allegation that they were spoken in the hearing of the 14 year old daughter and that she understood them. As against a demurrer, each allegation that the words were published was sufficient to charge that the language was used in the hearing of the 14 year old daughter and that she understood it. 233 P. at 1042.

It would seem the court's words were not meaningful unless, at trial, proof of hearing and understanding was required.

And finally we note that the federal district court in an unpublished memorandum decision in Stump v. S. H. Kress & Co., No. KC–2535 (D.Kan., Oct. 14, 1968) held that under Kansas law publication of a slander must be proven by direct evidence and not by circumstantial evidence.

The judgment is affirmed.