No. 58,647

Hiram Turner, *Appellee,* v. Halliburton Company and William Arend, *Appellants.*

(722 P.2d 1106)

Opinion filed July 30, 1986.

*Stephen J. Jones*, of Hershberger, Patterson, Jones & Roth, of Wichita, argued the cause and was on the brief for appellants.

*Christopher A. Rogers*, of Winfield, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

HOLMES, J.: Halliburton Company, Inc., (Halliburton) and its employee William Arend, defendants below, appeal from a jury verdict rendered in favor of Hiram Turner in a defamation and tortious interference with the right to contract case involving Turner's termination from employment for allegedly stealing company property. The jury returned a verdict in favor of Turner for $86,700.

Appellee first went to work for Halliburton in early 1981 as a bulk material operator in Winfield. He was considered a good employee until March 1983, when the events leading to his discharge and this lawsuit occurred. On March 11, 1983, Turner, who had the day off, and his neighbor John Coffey set out to find some automobile parts with which to repair Turner's car. Coffey drove his pickup truck and, upon leaving Gueda Springs where both lived, they proceeded to Arkansas City, Winfield, and Newkirk and Ponca City, Oklahoma. During their travels the two consumed a case of beer but were unsuccessful in locating the needed automobile parts. Finally, about 2:00 p.m. they contacted a man in Winfield who indicated he might have the necessary parts but that he would not be available until after 5:00 p.m. Turner and Coffey then decided to go fishing and on the way stopped in Gueda Springs and picked up Mike Burr. The next stop was Arkansas City where they replenished their beer supply and purchased some whiskey. They then spent the rest of the afternoon fishing and around 5:00 p.m. returned to Winfield where Turner was successful in obtaining the necessary parts. Turner claims the last thing he remembers is passing the Des-

perado Saloon on old highway 77, headed toward Gueda Springs. The next he remembers is waking up at home in Gueda Springs on the morning of March 12, 1983.

The evidence at trial disclosed that on the way home the three decided to stop at Daisy Mae's Cafe. Ron Ryser, another Halliburton employee, who was in the cafe, had his Halliburton truck parked in the parking lot. While in the parking lot, the three men took some Halliburton tools from Ryser's truck and placed them in Coffey's truck. They were observed taking the tools by other patrons of the cafe, who advised Ryser and also told him the other truck had a personalized license plate reading "Wizard." Ryser proceeded to the lot but before he could get there the truck with Wizard plates had departed. Ryser then reported to the Arkansas City police and to his superiors that the tools had been stolen by three men at Daisy Mae's parking lot. He also reported the description of Coffey's truck, including the distinctive Wizard license plate.

On Saturday morning, after Turner awoke, he went to Coffey's truck to retrieve his newly purchased auto parts and his fishing equipment. When he did so he observed the Halliburton tools and thought they looked familiar due to some distinguishing features. Later that day, Daniel Krueger, another Halliburton employee and a friend of Turner's, stopped by Turner's house and told him about the missing tools and the theft at Daisy Mae's Cafe. Turner took no action at that time. On Monday, March 14, 1983, Turner reported for work at Halliburton where the employees were talking about the theft of Ryser's tools. Investigation by the Arkansas City police inevitably led to John Coffey, who was picked up by the Sumner County sheriff's office on March 15. Turner was aware of Coffey's arrest (on other charges) and then called Ryser and told him he knew where the missing tools were located. Ryser advised Turner to return them to him and then called his superiors at Halliburton to report these latest developments. Turner waited until the evening of March 16 to return the tools to Ryser and, during that same evening, Turner was notified by telephone to report to the company offices at 8:00 a.m. the next morning. Also that evening, Turner was contacted by an officer of the Arkansas City police department relative to the missing tools. Turner advised the officer he did not know anything about them. The next morning, Turner reported to the

appellant William Arend and Gary Rodveldt, both managerial and supervisory employees, at the Halliburton offices. During this confrontation Turner's employment with Halliburton was terminated on the grounds he had stolen company property. During the interview he made no explanation of his connection with the missing tools except to state that he had been drinking the day of the theft and that he hadn't had anything to do with the missing tools. At trial Coffey and Burr testified that the tools were taken from the Halliburton truck because Turner wanted to play a joke upon his co-worker Ryser and that at the time all three of them were intoxicated. This testimony was consistent with the statements originally given to police by Coffey and Burr. At the meeting with Arend and Rodveldt, it was made clear to Turner that he was being terminated and that the reason was his theft of company property. While the appellant Arend was obviously upset and the conversation became heated and loud, there was no evidence that any other employees of Halliburton heard any part of the confrontation except Rodveldt, who was present in a supervisory capacity. There was no evidence that Arend or Rodveldt told any other Halliburton employees of the firing and reason therefor, except such supervisory and managerial personnel as were required to be notified under standard company procedure. It is also clear that Turner told his friend Krueger, and perhaps others, that he had been fired and the reason therefor. In any event it became common knowledge among the Halliburton employees, which would not be unexpected.

Being out of a job, Turner sought employment the same day with Ark City Packing Company and filled out an application form. In that application form Turner stated that his reason for leaving his Halliburton employment was "lay off." Turner well knew, at the time, he had been terminated at Halliburton for allegedly stealing company property. The same application form provided:

"I authorize any school or previous employer named in this application to provide Ark City Packing Company with any relevant information that may be required to arrive at any employment decision."

On April 28, 1983, Turner was interviewed by a personnel officer of Ark City Packing Company and considered satisfactory for employment "pending receipt of reference check." On April 30, 1983, an employee of the Ark City Packing Company personnel

office contacted Halliburton to verify Turner's former employment. She was advised that Turner had been terminated for "stealing company property." This inquiry was followed up by mailing a form to Halliburton seeking verification of the telephone report. Halliburton returned the form to Ark City Packing Company answering their various inquiries. The answers indicated that while Turner's work record had been satisfactory, he was not subject to rehire because of stealing company property. Upon receipt of this information, Turner's application for employment was given no further consideration by the packing company.

Turner filed this action against Halliburton and Arend asserting three causes of action: (1) defamation, (2) breach of the employment contract, and (3) tortious interference with the right to contract. He sought both actual and punitive damages. Upon completion of the evidence, the court dismissed count two of the petition, overruled defendants' motions for a directed verdict, and submitted the matter to the jury. The jury found for Turner on the defamation claim, awarding actual damages of $23,500 and punitive damages of $41,000 and on the claim of tortious interference with the right to contract, awarding $6,900 actual damages and $15,300 punitive damages for a total verdict of $86,700. Halliburton and Arend have appealed. Additional facts will be set forth as necessary for the various issues on appeal.

Appellants contend the trial court committed error when it overruled their motions for a directed verdict made at the end of plaintiff's evidence and again after all the evidence was presented, and in overruling motions for judgment notwithstanding the verdict. The basis of the motions as to the defamation verdict was twofold: first, the allegedly defamatory statements were subject to a qualified privilege requiring actual malice to be proven and there was insufficient evidence to support the verdict and, second, Turner is precluded from recovering damages as he failed to show any damage to his reputation. As to the interference with the right to contract, appellants claimed insufficient evidence and a duplication of recovery.

K.S.A. 60-250 allows a litigant to move for a directed verdict, and for judgment notwithstanding the verdict. In ruling on a motion for directed verdict pursuant to K.S.A. 60-250, the court is required to resolve all facts and inferences reasonably to be

drawn from the evidence in favor of the party against whom the ruling is sought and where reasonable minds could reach different conclusions based on the evidence the motion must be denied and the matter submitted to the jury. This rule must also be applied when appellate review is sought on a motion for directed verdict. *Sampson v. Hunt,* 233 Kan. 572, Syl. ¶ 1, 665 P.2d 743 (1983). The same test is applicable to a motion for judgment notwithstanding the verdict. 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-250 (1979).

The law of defamation, including both libel and slander, is a fascinating subject which always seems to be in a state of flux. As stated by Justice Wedell, "In actions involving libel or slander the temptation quite naturally exists to write a treatise on the subject." *Bennett v. Seimiller,* 175 Kan. 764, 766, 267 P.2d 926 (1954). The constraints of time, fortunately, prevent our doing so in this case. For those interested, certain areas of the subject have recently been given exhaustive consideration in a trilogy of cases before this court: *Gobin v. Globe Publishing Co.,* 216 Kan. 223, 531 P.2d 76 (1975); *Gobin v. Globe Publishing Co.,* 229 Kan. 1, 620 P.2d 1163 (1980); and *Gobin v. Globe Publishing Co.,* 232 Kan. 1, 649 P.2d 1239 (1982).

The first issue raised by appellants is that they were entitled to prevail, as a matter of law, in the defamation action because they were privileged in their communications and no evidence was presented to support a finding of actual malice.

In any proceeding where the plaintiff complains that he or she has been defamed, a number of affirmative defenses are available, among them privilege and truth. Whether a privilege is available in an action for defamation must be determined based on the status of the particular defendant and the content of the alleged defamatory communication. To facilitate the effective performance of government, absolute privilege is granted by constitution, legislative enactment or case law to those who serve in a legislative, executive or judicial capacity. *Redmond v. Sun Publishing Co.,* 239 Kan. 30, 36, 716 P.2d 168 (1986). A qualified or limited privilege is granted to those with a special interest or duty in the subject matter of the communication. *Redmond v. Sun Publishing Co.,* 239 Kan. at 36. The availability of a limited privilege is generally restricted to those situations where public policy is deemed to favor the free exchange of

information over the individual's interest in his or her good reputation. One such qualified privilege exists with respect to business or employment communications made in good faith and between individuals with a corresponding interest or duty in the subject matter of the communication. *Luttrell v. United Telephone System, Inc.,* 9 Kan. App. 2d 620, 683 P.2d 1292 (1984); *Munsell v. Ideal Food Stores,* 208 Kan. 909, 494 P.2d 1063 (1972). The question whether or not a publication is privileged is a question of law to be determined by the court. *Munsell v. Ideal Food Stores,* 208 Kan. at 921.

"Where a defamatory statement is made in a situation where there is a qualified privilege the injured party has the burden of proving not only that the statements were false, but also that the statements were made with actual malice—*with actual evil-mindedness or specific intent to injure.*" *Munsell v. Ideal Food Stores,* 208 Kan. at 920-21.

See also *Stice v. Beacon Newspaper Corporation,* 185 Kan. 61, 340 P.2d 396 (1959); PIK Civ. 2d 14.54.

In general, the question of actual malice in a defamation action is a question for the jury. However, under certain circumstances, a motion for directed verdict and the granting of that motion is appropriate.

" 'If the plaintiff fails to offer evidence of an extrinsic character to prove actual malice on the part of the defendant, in the publication of a libel on a qualifiedly privileged occasion, and if the language of the communication and the circumstances attending its publication by the defendant are as consistent with the nonexistence of malice as with its existence, there is no issue for the jury, and it is the duty of the trial court to direct a verdict for the defendant.' " *Marsh v. Commercial and Savings Bank of Winchester, Va.,* 265 F. Supp. 614, 621 (W.D. Va. 1967).

In *Hall v. Hercules, Incorporated,* 494 F.2d 420 (10th Cir. 1974), a Tenth Circuit Court opinion applying Kansas law, the court upheld the trial judge, who had directed a verdict for defendant where there was no evidence of actual malice. See also *Steere v. Cupp,* 226 Kan. 566, 602 P.2d 1267 (1979), wherein a majority of this court found that summary judgment was proper in a libel case.

In the present case, the allegedly defamatory statements pertaining to Turner's termination, that he stole company property, were communicated to supervisory and managerial employees of Halliburton in its ordinary course of business, to police officers who were conducting an investigation into the reported theft of tools, and to Ark City Packing Co. in connection with Turner's

application for employment. It appears clear from the record that Turner took the tools out of the Halliburton pickup while it was parked in Daisy Mae's parking lot. Both Coffey and Burr testified that Turner took the equipment to play a joke or prank on a fellow employee. Turner has never denied taking the tools from the back of the pickup, but instead claims to have been so intoxicated at the time that he has no recollection of the event. While Turner alluded to the fact that his termination because of theft was widely known, he failed to produce any evidence to prove that this information came from communications from the defendants. Two Halliburton employees, Ron Ryser and Daniel Krueger, possessed independent knowledge of the incident. Additionally, Turner told Krueger of his termination and the basis therefor.

The evidence relied upon by appellee to establish actual malice is detailed in his brief and will be reviewed here in the best possible light from appellee's standpoint. Arend, at the termination meeting, accused Turner of theft of the tools, other thefts, and of fencing property in Gueda Springs; Arend did not undertake his own outside investigation after being advised Turner was involved in the missing tools incident; there were discrepancies between the police officers' testimony and that of Arend as to when the officers first talked to Arend and gave him the information that Turner was involved; Arend made statements to police that Turner may have been involved in other thefts of company property and was being watched; Arend also stated he wanted Turner prosecuted; Ryser valued the tools at $80.00, while Arend valued them at cost less 20% for a figure of $125.88; Halliburton had a list of 69 different grounds for termination but Arend chose stealing company property, knowing this would go into Turner's records and possibly be relayed to other prospective employers; and Arend had a bad attitude at the conference wherein Turner was terminated.

At best the evidence relied upon by Turner to prove evil-mindedness or specific intent to injure shows an employer who was understandably upset over the theft of the Ryser and other company tools, and who had been given information that Turner was involved in the disappearance of the Ryser tools. For an employer to classify such a disappearance as a theft or the stealing of company property would be the natural and logical conclusion under the facts of this case. Turner makes much of a

failure by Arend to make an investigation. He appears to contend that Arend should have contacted Coffey and Burr, neither of whom were Halliburton employees, and makes much of Arend's failure to seek out other witnesses. Such activities are more appropriately left to the police. If Arend had undertaken an investigation prior to his meeting with Turner, there might be serious questions about the propriety of such action. Following the meeting with Turner, where Turner continued to maintain that he was drunk and didn't know anything about the alleged theft of the tools, Arend had no alternative but to terminate Turner and chose to report the appropriate grounds for his action. There is no showing in the record before us that any of the other sixty-eight possible reasons for termination would have been applicable. The only showing of evil-mindedness or specific intent to injure comes from the assumptions of the appellee in his brief and not from the evidence produced at trial. It is unfortunate that Turner's "prank" or "joke" backfired and that he suffered unanticipated and unwanted results, but that, in and of itself, does not show malice by or place liability upon the defendants. Turner created the situation which led to the unfortunate results.

Employee conduct, particularly involving theft, is a matter within the bounds of the qualified privilege pertaining to communications within the company. All of the Halliburton personnel who testified to having knowledge of the communications were shown to be managerial level employees with an interest in the situation. While evidence was offered to indicate the defendant Arend was upset about the taking of Halliburton property, no evidence tended to establish an evil motive on the part of the defendants. Therefore, with respect to the intra-company communications, it does not appear Turner overcame the defendants' privilege by proving actual malice.

A privilege also existed with respect to communications between Halliburton and Ark City Packing. *High v. Hardware Co.,* 115 Kan. 400, 223 Pac. 264 (1924); 50 Am. Jur. 2d, Libel and Slander §§ 202, 271. See generally Annot., Defamation—Employer's Qualified Privilege, 24 A.L.R. 4th 144. Therefore, it is also necessary for Turner to demonstrate actual malice on the part of the defendants to be entitled to recover on this claim.

At trial the plaintiff presented Carolyn Borror, who was in charge of screening applicants at Ark City Packing Co. Borror

testified that she had accepted an application for employment from the appellee. Turner's application indicated that he had formerly worked for Halliburton and the reason for his unemployed status was "lay off." When Borror checked with Turner's former employer, Halliburton, she was informed that Turner was terminated for "stealing company property." This information was provided over the telephone by Wilbur Bright, and subsequently confirmed by written communication. Again there is absolutely no evidence that the appellants acted with evil-mindedness or specific intent to injure Turner. The rule stated in *Munsell v. Ideal Food Stores*, 208 Kan. 909, Syl. ¶ 1, and in 50 Am. Jur. 2d, Libel and Slander § 149, would also appear to preclude recovery on the basis of Turner's consent to or request for the communication to Ark City Packing Co. See also *Richters v. Rollins Protective Service Co., Inc.*, 442 F. Supp. 941 (D. Kan. 1977).

The communications with the police department were initiated by the police during a routine investigation of the reported theft of the Halliburton tools. There was a duty on the part of Halliburton's employees to cooperate in that investigation and the communications were subject to a qualified privilege. *Marsh v. Commercial and Savings Bank of Winchester, Va.*, 265 F. Supp. 614.

The trial court correctly ruled, and appellee does not contend otherwise, that the communications complained of were subject to a qualified privilege. The evidence, considered only in the light most favorable to the plaintiff, is insufficient to show actual malice upon the part of the defendants.

We hold that, based upon this record, when all of the facts and the inferences to be drawn therefrom are resolved in favor of Turner, there is no credible evidence to support a finding of actual malice upon the part of the defendants. The judgment on the defamation issue must be reversed. In view of the decision reached upon this issue, it is not necessary for us to consider the question of whether *Gobin v. Globe Publishing Co.*, 232 Kan. 1, requires actual proof of damage to reputation when the defendant is not a member of the news media. That question must be left for another day.

The remaining issue is whether the trial court erred in failing to sustain defendants' motions for a directed verdict or for judg-

ment notwithstanding the verdict as to plaintiff's claim of tortious interference with contractual relations. Much of what has already been said applies equally to this issue.

Kansas has long recognized that a party who, without justification, induces or causes a breach of contract will be answerable for damages caused thereby. *Vaught v. Pettyjohn & Co.*, 104 Kan. 174, 178 Pac. 623 (1919); *Nulty v. Lumber and Grain Co.*, 116 Kan. 446, 227 Pac. 254 (1924); see also Restatement (Second) of Torts § 766 (1977); Prosser & Keeton on Torts § 129, p. 978-1004 (5th ed. 1984). It is also recognized that a cause of action exists for tortious interference with a prospective business advantage or relationship. The requirements for this tort were recently set forth in *Maxwell v. Southwest Nat. Bank, Wichita, Kan.*, 593 F. Supp. 250, 253 (D. Kan. 1984), as: (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate result of defendant's misconduct.

Both tortious interference with a contract and tortious interference with contractual expectations or a prospective business advantage are predicated on malicious conduct by the defendant. While these torts tend to merge somewhat in the ordinary course, the former is aimed at preserving existing contracts and the latter at protecting future or potential contractual relations. Here, it is contended that appellants, by communicating to Ark City Packing Co. that Turner had been terminated for "stealing company property," interfered with his prospects for employment and caused Turner to fail to obtain that employment.

It is recognized that not all interference in present or future contractual relations is tortious. A person may be privileged or justified to interfere with contractual relations in certain situations. *May v. Santa Fe Trail Transportation Co.*, 189 Kan. 419, 424-25, 370 P.2d 390 (1962). See also Restatement (Second) of Torts § 767. In 45 Am. Jur. 2d, Interference § 27 it is stated:

"Justification is the most common affirmative defense to an action for interference. The term 'justification' has been said not to be susceptible of any precise

definition. It is employed to denote the presence of exceptional circumstances which show that no tort has been in fact committed and to connote lawful excuse which excludes actual or legal malice. It has been suggested that, rather than to express this defense to interference in terms of justification, it might be more accurately stated to be a matter of privilege; that is, the defendant may show that interference, although it occurred, is privileged by reason of the interests furthered by his conduct. Whichever word is used, the defense comes into play only after interference has occurred, as shown by judicial statements that interference is actionable only if without justification or, alternately, that interference which is justifiable is not actionable, and that one is not liable in damages even though his acts and conduct constitute interference with contractual rights of another if he employs fair means and acts in good faith and with justification.

"The law has crystallized relatively few concrete rules to determine the existence or want of justification or privilege in connection with the tort of interference. The issue raised on a plea of justification has been said to depend on the circumstances of the particular case, bearing in mind such factors as the nature of the interferer's conduct, the character of the expectancy with which the conduct interfered, the relationship between the various parties, the interest sought to be advanced by the interferer, and the social desirability of protecting the expectancy or the interferer's freedom of action. Generally, a circumstance is effective as a justification if the defendant acts in the exercise of a right equal or superior to that of the plaintiff, or in the pursuit of some lawful interest or purpose, but only if the right is as broad as the act and covers not only the motive and purpose but also the means used." pp. 304-05.

Occasions privileged under the law of defamation are also occasions in which interference with contractual relations may be considered justified or privileged. Prosser & Keeton on Torts § 129, p. 989. It appears that in the area of interference with prospective contractual relations the terminology of privilege, proper vs. improper, and justification are used interchangeably with no overwhelming preference for any term. Kansas has not previously dealt with the existence of a privilege or justification for a former employer to communicate information from personnel files regarding a former employee. Other jurisdictions have recognized such a privilege where an employee's record of performance was an issue. In *Leibowitz v. Szoverffy*, 80 App. Div. 2d 692, 436 N.Y.S.2d 451 (1981), a former teacher brought an action against her department chairman for tortious interference with contractual relations and libel after she had been denied tenure. On appeal the court held that summary judgment was properly granted, stating:

"A predicate for both alleged causes of action is malice. As to the tortious interference with contractual relations cause of action, the defendant's conduct must be shown to be solely malicious [citation omitted]." p.693.

The Restatement (Second) of Torts considers the subject more in the light of what conduct is improper when tortious interference with a prospective contractual relation is alleged rather than in the terms of privilege or justification. Section 767 provides:

"In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,
(b) the actor's motive,
(c) the interests of the other with which the actor's conduct interferes,
(d) the interests sought to be advanced by the actor,
(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
(f) the proximity or remoteness of the actor's conduct to the interference, and
(g) the relations between the parties."

Thus, it appears clear that there may be justification or a qualified privilege in an action for tortious interference with a business prospect. In the terms of the Restatement, if the actions complained of were not improper there is no ground for recovery. Here, Ark City Packing Co. was considering hiring appellee and inquired of Halliburton as to his work record and reason for termination. Halliburton's employee then transmitted to the packing company the information that Turner was terminated for stealing company property. This statement was technically true. In the present world of trade and commerce, it is imperative that a prospective employer have access to information about an employee's prior work record from sources other than the prospective employee. As shown by the facts in this case, not every prospective employee will give truthful information on an employment application. Where the allegation of tortious interference with contract, or the prospect of a contract, is based upon alleged defamatory statements from the former employer to the prospective employer, we hold that such communication is subject to a qualified privilege which requires the plaintiff to prove actual malice by the defendant in making such communication. Such would appear to be clearly required in the present case where Turner authorized the communication, knew the grounds for his termination, and knew that they would be relayed to Ark City Packing Co. Assuming the allegation that Turner stole company property was false, which was certainly open to ques-

tion at the time all the communications herein were made, the evidence relied upon to show malice is the same as previously detailed in our discussion of the defamation issue. Again, we hold there was no credible evidence to sustain the verdict for tortious interference with a contractual right or business prospect. In view of the decision reached, we are not called upon to determine whether recovery for interference with Turner's application for employment constituted a double recovery when based upon the same facts and allegedly defamatory statements as relied upon in the defamation action.

The judgment is reversed.

HERD, J., dissenting: I strongly disagree with the majority. The opinion has broad, undesirable implications. It improperly removes fact issues from the jury. It authorizes an employer to falsely and with impunity brand an employee as a criminal. This is accomplished by the majority's holding that Halliburton's firing of Hiram Turner for theft of property was a "technically true" statement absent supporting evidence. The jury held otherwise. Thus, we must presume there was no substantial competent evidence to support the verdict. Let us examine the law and the evidence.

K.S.A. 1985 Supp. 21-3701 provides:

"Theft is any of the following acts done with intent to deprive the owner permanently of the possession, use or benefit of the owner's property . . . ."

K.S.A. 21-3110(6) defines "deprive permanently":

"(a) Take from the owner the possession, use or benefit of his or her property, without an intent to restore the same; or

"(b) Retain property without intent to restore the same or with intent to restore it to the owner only if the owner purchases or leases it back, or pays a reward or other compensation for its return; or

"(c) Sell, give, pledge or otherwise dispose of any interest in property or subject it to the claim of a person other than the owner."

Kansas statutes consolidate the crimes of larceny, embezzlement, etc., into one crime designated as theft. Therefore when Halliburton used the terms "stealing" or "theft," both terms came under the definition of theft. Theft is a specific intent crime. Thus, a taking must be accompanied by a specific intent to permanently deprive the owner of the property.

The evidence is uncontroverted that Hiram Turner was a good Halliburton employee and on his day off, March 11, 1983, he

journeyed to Arkansas City, Winfield and Ponca City, Oklahoma with John Coffey searching for a used carburetor for his car. It is also uncontroverted that the two of them consumed two cases of beer and a pint of whiskey in the course of their journey. They picked up Mike Burr late in the afternoon. On the way home they went to Daisy Mae's cafe in Arkansas City and shot pool. Ron Ryser, another Halliburton employee, was in the cafe. Burr and Turner got too boisterous, causing Coffey to ask them to leave with him. When they got outside, Turner suggested they play a joke on his Halliburton co-worker by taking a propane tank and pipe wrench from his pickup. This they did, placing the purloined items in the back of Coffey's pickup. Burr remained in Arkansas City and Coffey and Turner proceeded back to Gueda Springs. Turner arrived home at 7:00 p.m., staggered into the house, and passed out on the couch. The evidence of Turner's state of intoxication from mid-afternoon until he got home is not challenged. Also the evidence is uncontroverted that the property was taken from Turner's co-worker's pickup in a drunken attempt to play a joke on the co-worker. The jury was not only entitled to believe the evidence, it had no other choice; no evidence to the contrary was introduced.

There are two reasons Turner's action was not theft; (1) There is no evidence of intent to permanently deprive the owner of his property; (2) intoxication is a defense to a specific intent crime. Thus, Arend's statement that Turner stole the property was a false statement.

The next issue is whether the false statement was published. There is controversy on how many persons were in the trailer office when Arend fired Turner on March 17, 1983. Turner testified there were three people present in addition to him and Arend. Arend says there was only one other person present— Gary Rodveldt. This issue is unimportant since it is admitted Halliburton circulated the information that Hiram Turner was fired for theft of property throughout the company's chain of command in El Dorado, Wichita, and Duncan, Oklahoma, and to Ark City Packing Company, in response to an inquiry. Halliburton's defense is that Turner published the cause of his termination to his friends and consented to Ark City Packing requesting information about his employment record. However, it must be remembered Turner's consent for Ark City Packing to make

inquiry about his employment record did not carry with it consent for Halliburton to make a false statement about him. It is apparent there was substantial competent evidence to support the jury verdict of publication.

Finally, we come to the issue of malice. I agree with the majority that where a qualified privilege exists, the defendant cannot be liable for defamation unless the plaintiff proves the communication was made with actual malice. Halliburton had a qualified privilege as an employer of Turner. I disagree, however, with the conclusion drawn by the majority that the definition of malice in *Munsell v. Ideal Food Stores*, 208 Kan. 909, 920-21, 494 P.2d 1063 (1972), requires more and different evidence than that of publication with knowledge of falsity or publication of a false statement with reckless disregard for truth or falsity. The majority holds there was no evidence introduced of "actual evil-mindedness or specific intent to injure" and reversed the jury's verdict for Turner on his defamation claim. I think publication of a false defamation statement knowing it to be false or publication of such statement with reckless disregard for the truth is actual evil-mindedness and evidence of a specific intent to injure the victim.

The majority has deliberately chosen to ignore the definition of malice given to the jury in this case. The jury was instructed on malice as defined in *New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964), and adopted by this court in *Hein v. Lacy*, 228 Kan. 249, 258, 616 P.2d 277 (1980), and *Schulze v. Coykendall*, 218 Kan. 653, 661, 545 P.2d 392 (1976). The instruction provided as follows:

"Proof of actual malice in defamation actions when a conditional privilege is found to exist requires a plaintiff to prove that the publication was made with knowledge that the defamatory statement was false or with reckless disregard of whether it was false or not."

It is argued by some that the *New York Times Co. v. Sullivan* definition of malice applies only to media defendants. That is not true. As illustrated by *Hein v. Lacy* and *Schulze v. Coykendall*, both of which were decided after *Munsell*, we have used the *New York Times* definition in qualified privilege cases not pertaining to media defendants. In *Schulze v. Coykendall*, 218 Kan. 653, we set forth a definition of malice which is identical to that received by the jury in this case. We stated at syllabus ¶ 9:

"Proof of actual malice in defamation actions when a conditional privilege is found to exist requires a plaintiff to prove that the publication was made with knowledge that the defamatory statement was false or with reckless disregard of whether it was false or not."

See also Restatement (Second) of Torts § 580B (1976); Thompson, *Kansas Defamation Law: An Update,* 54 J.K.B.A. 258 (1985); *Dobbyn v. Nelson,* 2 Kan. App. 2d 358, 579 P.2d 721, *aff'd* 225 Kan. 56, 587 P.2d 315 (1978).

It is interesting to note that in an early Kansas case on this subject, *Coleman v. MacLennan,* 78 Kan. 711, 741, 98 Pac. 281 (1908), the court set out how to prove actual malice as follows:

"When it comes to this proof there is no presumption, absolute or otherwise, attaching to a charge of crime. The proof is made from an interpretation of the writing, its malignity or intemperance, by showing recklessness in making the charge, pernicious activity in circulating or repeating it, its falsity, the situation and relations of the parties, the facts and circumstances surrounding the publication, and by other evidence appropriate to a charge of bad motives, as in other cases."

I submit *MacLennan* shows that malice may be proven in a variety of ways, among which is the *New York Times Co. v. Sullivan* method, none of which are exclusive but all of which are available in any qualified privilege case. In this case the *New York Times* definition was applicable.

The instruction was correct, but if the majority believes the jury was improperly instructed on malice, then the plaintiff deserves a new trial. I would hold, however, that under whatever standard used, the plaintiff has proven defendants acted with malice. Bearing in mind that we must accept as true the evidence and all inferences therefrom which support or tend to support the verdict, let us review the evidence in support of a finding of malice on the part of the defendants.

William Arend, Halliburton's district manager, heard of Ryser's missing property at a supervisors' meeting Monday, March 14. He first testified he talked to Lt. Santiago on March 15 and learned from him that John Coffey had implicated Turner as the person who took the missing property. From this information, Arend concluded Turner was a thief. Arend later retracted this testimony and admitted his conversation was with Officer Jeff Moore rather than Lt. Santiago. Officer Moore testified his conversation with Arend occurred on March 17, or later, which is after Turner was fired. This is significant because it shows Arend

did not get the information about Turner from the police. He testified he did not talk to Coffey or Burr. Thus, Arend's information came from the unconfirmed statements at the supervisors meeting—a mere rumor. Arend told Officer Moore he had suspected Turner of other thefts and that he had been watching Turner since he moved to Gueda Springs. Arend made similar statements to Hiram Turner at the meeting where he fired him. Arend refused to listen to Turner's version of what happened and refused to talk to Coffey and Burr. He independently reached the conclusion he had caught the thief and fired Turner for theft of property. He then raised the value of the missing property from $80, the value given by Ryser, to $125, making the offense a felony, which indicated his intention to "get" Turner.

Arend fired Turner with no investigation and no evidence to support his personal belief that Turner was responsible for the theft of company property. As a result, Turner was branded as a thief to all potential future employers. Arend's action is as clear a case of reckless disregard of the truth or falsity of a defamatory publication as can be found. Although the jury was instructed it need only find reckless disregard for the truth or falsity of the statement, the evidence presented to the jury was also sufficient to show a "specific intent to injure" on the part of Arend. There is substantial competent evidence to support the jury's finding of malice.

The malice shown by Arend's actions also supports the jury verdict for interference with contractual relations and punitive damages.

The scope of appellate review of a motion for a directed verdict is to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought and where the evidence is such that reasonable minds could differ, the motion must be denied and the case submitted to the jury. See *Scarpelli v. Jones,* 229 Kan. 210, 215, 626 P.2d 785 (1981).

Under the scope of appellate review for testing the sufficiency of the evidence to support a jury verdict, we must accept as true the evidence and all inferences to be drawn therefrom which support or tend to support the verdict and disregard any conflicting evidence or other inferences which might be drawn therefrom, and if there is any substantial competent evidence to

support the jury's verdict, it must not be disturbed on appeal. See *In re Estate of Robinson,* 236 Kan. 431, 439, 690 P.2d 1383 (1984).

In applying the foregoing rules of appellate review, as we must, we are without authority to overturn the jury's verdict.

I would affirm the trial court.

PRAGER and LOCKETT, JJ., join the foregoing dissenting opinion.