NOT DESIGNATED FOR PUBLICATION

No. 115,353

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ELIZABETH HERRMAN,
*Appellant*,

v.

BRANDON WILLIAMS,
*Appellee.*


MEMORANDUM OPINION


Appeal from Sedgwick District Court; KEVIN J. O'CONNOR, judge. Opinion filed December 16, 2016. Affirmed.


*Elizabeth Herrman*, appellant pro se.


*Melissa A. Tucker Pope* and *Richard W. James*, of DeVaughn James Injury Lawyers, of Wichita, for appellee.


Before MALONE, C.J., GREEN and LEBEN, JJ.


LEBEN, J.: On February 25, 2015, Elizabeth Herrman was the substitute teacher for Brandon Williams' language-arts classes at Wichita East High School. When Williams returned to work the next day, his students and some other teachers told him that Herrman had had a variety of inappropriate conversations with his students instead of following his lesson plans. Williams collected these reports and submitted a negative evaluation of Herrman's performance by email to the principal and a few others at the school. Herrman then filed a lawsuit alleging that Williams' email was defamatory and caused her to be fired. The district court granted summary judgment for Williams, finding

that Herrman hadn't properly contested any of the facts in Williams' summary-judgment motion and that Williams' statements were protected under what's known as qualified privilege, which serves as a defense to a defamation claim.

Herrman raises three arguments on appeal. First, she claims that the district court abused its discretion when it ruled on the procedural failings of her response to Williams' summary-judgment motion. But her response was filed after the deadline, and it failed to provide any evidence that contradicted Williams' factual statements, so the district court reasonably found that the facts Williams presented weren't contested. Second, Herrman claims that qualified privilege doesn't apply to Williams' email. But the privilege applies to statements made in good faith by a person with a particular interest in the statement to someone else who has the same interest. Williams' email falls squarely within that privilege: in the interest of ensuring that his students have quality teachers, he sent the email to others at the school who share that interest, and the email didn't go beyond the scope of evaluating Herrman's performance in his classroom. And on the facts presented in Williams' motion, there was no evidence of bad faith on his part. Third, Herrman argues that the district judge should have recused himself, but there's absolutely no indication in our record that the judge couldn't be impartial, so it was reasonable for him to remain on the case.

FACTUAL AND PROCEDURAL BACKGROUND

We take our facts from Williams' motion for summary judgment, which provided evidence in support of each factual claim—evidence that Herrman didn't counter with evidence of her own. Williams teaches language arts at Wichita East High School. Herrman was a substitute teacher in the school district. Williams and Herrman have never met.

2

Substitute teachers are temporary employees who can be fired without notice for any reason. A substitute teacher's responsibility is to follow the lesson plans prepared by the teacher. On February 25, 2015, Herrman taught Williams' classes. When Williams returned to school the next day, he discovered that his students hadn't completed their assignments.

On February 27, Williams wrote an email negatively evaluating Herrman's performance as a substitute teacher and sent it to the principal, the secretary, and two other language-arts teachers. The secretary forwarded the email to Heather Kiehl, who manages the substitute-teacher office for the school district, and Kiehl's assistant. It's standard practice to evaluate a substitute's performance.

Williams said he gave Herrman's performance one star "because negative stars are not available." He said that Herrman hadn't collected assignments in his creative-writing class because, according to reports from his students, Herrman thought that he probably wasn't a good teacher and that the assignment was "stupid because it did not follow the rules of literature." The email's subject line is "Shocking Statements from My Substitute on 2/25/15," and in it Williams wrote that Herrman "either blatantly disregarded her instructions or distracted students by having conversations on a wide variety of inappropriate and shocking topics." Williams noted that "students tend to embellish their stories" but added that the students' reports were confirmed by other teachers and school employees. He wrote that his students had reported to him that Herrman had told them she'd had two abortions, though he didn't know the context in which the subject came up. He then listed, without further comment, 28 statements that Herrman made or topics she discussed in his classroom, according to his students. The list includes some basic biographical facts about Herrman (that she's a Libertarian, that she has a journalism degree, that she has cats) as well as Herrman's opinions on the death of Eric Garner, homosexuality, and President Obama.

3

Herrman responded to Williams' email with a personal statement, dated March 4, in which she provided her version of what had happened. (She included this document with her amended petition.) Herrman claimed that most of the statements listed in Williams' email had been taken out of context, and she attempted to provide that context in her statement. According to Herrman, the students had "a bad attitude and no interest in the assignment," so she decided to give them "a quick, five-minute, motivational speech about words and writing." She wrote that after the students broke into groups, they weren't doing the assignment and were having conversations about politics and sex and pregnancy—she said that most of the statements on Williams' list happened during these student-initiated conversations while she was trying to steer them back to the assignment. She admitted that she had discussed her abortions with the students: "I don't know why I revealed such personal information but I suppose I just got worn down by the questions." But she completely denied making some other statements attributed to her, including that she didn't want to ruin her life by having kids and that "[p]oor black people have children for welfare."

On March 9, Herrman attended a personnel conference with Kiehl, the substitute-teacher manager, to discuss the negative evaluation. According to Kiehl, substitute teachers who receive five or more negative evaluations are usually fired. A written summary of the conference said that Herrman had received seven negative evaluations in the previous 8 years and that the most recent evaluation (from Williams) had reported that Herrman had made "numerous inappropriate comments during class time." On the same day, the school district accepted Herrman's resignation in place of firing her.

In April 2015, Herrman sued Williams for defamation based on the contents of his email evaluation. After the district court denied Herrman's motion for summary judgment, she wrote a letter asking the district judge to recuse (or disqualify) himself from presiding over the case any longer because she felt intimidated by him during hearings. Williams filed a summary-judgment motion in October 2015. At a hearing in

4

December, the district court denied Herrman's recusal motion and granted Williams' motion for summary judgment.

Herrman now appeals to this court.

ANALYSIS

I. *A Qualified Privilege Applies to Williams' Allegedly Defamatory Statements.*

Herrman argues that the district court shouldn't have granted summary judgment for Williams because the doctrine of qualified privilege—which is a defense to defamation—doesn't apply to Williams' statements.

We begin with an explanation of how summary judgment works. A motion for summary judgment asks the court to decide the case without holding a trial because none of the relevant facts are in dispute and, based on those facts, the law clearly dictates who should win. K.S.A. 2015 Supp. 60-256; Black's Law Dictionary 1664 (10th ed. 2014). Stated in more traditional legal terms, a district court should grant summary judgment when the pleadings, discovery responses, and affidavits show that there is no genuine issue as to any material fact and that the party who filed the motion is entitled to judgment as a matter of law. *Drouhard-Nordhus v. Rosenquist*, 301 Kan. 618, 622, 345 P.3d 281 (2015). The district court should resolve all facts and inferences in favor of the party opposing summary judgment. 301 Kan. at 622. But the opposing party, to avoid summary judgment, must present evidence showing that the material facts—facts that determine the outcome of the case—are genuinely disputed. See 301 Kan. at 622. When the opposing party loses and appeals, we apply the same rules, and if there is no genuine issue as to any material fact and the district court correctly applied the law, we will hold that summary judgment was properly granted. 301 Kan. at 622. So there are two parts to a summary-judgment ruling: the facts and the law.

We'll start with the facts. The procedure for summary-judgment motions is set out in Supreme Court Rule 141. A summary-judgment motion should list, in numbered paragraphs, the uncontested and material facts, citing evidence to support those facts. Supreme Court Rule 141(a) (2015 Kan. Ct. R. Annot. 242). Then the opposing party has 21 days to respond. Supreme Court Rule 141(b)(2) (2015 Kan. Ct. R. Annot. 242). The response should list the numbered factual statements and state, for each one, whether it is "uncontroverted," "uncontroverted for purposes of the motion only," or "controverted." Supreme Court Rule 141(b)(1) (2015 Kan. Ct. R. Annot. 242). "Controverted" just means "contested"—to deny that something is true. Black's Law Dictionary 404 (10th ed. 2014). To controvert a factual statement, the opposing party must summarize and cite to some conflicting evidence. Supreme Court Rule 141(b)(1) (2015 Kan. Ct. R. Annot. 242). If the opposing party doesn't respond to the motion within 21 days, the court will accept the facts in the motion as true and uncontroverted. Supreme Court Rule 141(f)(2) (2015 Kan. Ct. R. Annot. 242).

Here, Williams filed a motion for summary judgment on October 22, 2015, arguing that his statements were protected by qualified privilege. He attached several exhibits to his motion, including Herrman's responses to discovery, affidavits (written testimony under oath) from Williams and Kiehl, notes from Herrman's personnel conference, and Herrman's resignation letter. Herrman had 21 days—until November 12, 2015—to respond to Williams' motion and present evidence to dispute the material facts. Supreme Court Rule 141(b)(2) (2015 Kan. Ct. R. Annot. 242). Herrman filed her response late and in two parts, on November 20 and 24, 2015 (8-12 days late and 29-33 days after Williams' motion). So because Herrman failed to respond on time, the district court correctly found that it was free to accept the facts in Williams' motion as true. Supreme Court Rule 141(f)(2) (2015 Kan. Ct. R. Annot. 242).

But even if we consider Herrman's late response, she didn't properly controvert any of the facts in Williams' motion. Several pages of her response attempt to contest statements from an earlier court filing and to contest the truth of the allegedly defamatory statements, neither of which is central to resolution of the motion, which asserts that a qualified privilege applies to the statements. She entirely ignores factual statements 1-6, 10, 12-24, 26-27, and 29, and only attempts to controvert statements 7-9, 11, 25, and 28. Applying Rule 141, the district court found that Herrman had admitted the factual statements that she hadn't specifically responded to. The district court then reviewed Herrman's attempt to controvert statements 7-9, 11, 25, and 28, and found that in each case, she hadn't cited to any actual evidence; instead, she simply explained her own beliefs about those facts. See *Simmons v. Porter*, 45 Kan. App. 2d 177, 181-82, 245 P.3d 1091 (2011) (the fact that a party has an explanation of the uncontroverted facts does not necessarily make them controverted), *rev'd on other grounds* 298 Kan. 299, 312 P.3d 345 (2013). The district court therefore found that Herrman didn't comply with Rule 141 and accepted all of Williams' facts as uncontested.

Herrman argues on appeal that she substantially complied with Rule 141, so the district court shouldn't have rejected her attempt to controvert Williams' factual statements. We review the district court's decision on this narrow question for an abuse of discretion, asking if the district court made an error of law or fact or if no reasonable person would agree with its decision. *Molina v. Christensen*, 30 Kan. App. 2d 467, 469-70, 44 P.3d 1274 (2001) (citing *Ruebke v. Globe Communications Corp.*, 241 Kan. 595, 604, 738 P.2d 1246 [1987]). Kansas courts have stated that substantial compliance is all that's required under Rule 141. *Rhoten v. Dickson*, 290 Kan. 92, 104-05, 223 P.3d 786 (2010). But we cannot say that the district court abused its discretion in these circumstances. Put simply, while Herrman tried to specifically controvert some of Williams' facts, she didn't actually produce any evidence to contradict any of Williams' factual statements. She cites to one outside document in her summary-judgment response: a "personal statement" in which she explains, from her perspective, what happened in the

7

classroom on February 25, 2015. But this personal statement isn't an affidavit, isn't signed, and wasn't submitted to the court under penalty of perjury. See K.S.A. 2015 Supp. 60-256(e)(2) ("[A]n opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must, by affidavits or by declarations . . . set out specific facts showing a genuine issue for trial."); K.S.A. 53-601 (unsworn declaration acceptable if signed with statement that it's under penalty of perjury); see Black's Law Dictionary 68 (10th ed. 2014) (defining "affidavit" as "[a] voluntary declaration of facts written down and sworn to"). The district court didn't abuse its discretion when it applied Rule 141: a reasonable person could agree with its decision that because she cited to no evidence, Herrman hadn't properly controverted any of the facts in Williams' summary-judgment motion.

Moving on from the facts to the law, in Kansas, defamation has three basic elements: (1) false and defamatory words (2) that are communicated to someone else and (3) that injure the reputation of the person defamed. *Byers v. Snyder*, 44 Kan. App. 2d 380, 396, 237 P.3d 1258 (2010) (citing *Droge v. Rempel*, 39 Kan. App. 2d 455, 459, 180 P.3d 1094 [2008]). But one of the defenses to a claim that a statement is defamatory is that the statement was privileged, either absolutely (statements made by people working in a legislative, executive, or judicial capacity) or with some qualification (based on the person's interest in making the statement). *Turner v. Halliburton Co.*, 240 Kan. 1, 7-8, 722 P.2d 1106 (1986). In this case, we are concerned only with qualified privilege, which exists because of a policy judgment that, in certain situations, the free exchange of information is more important than an individual's interest in protecting his or her reputation. 240 Kan. at 7-8.

Generally, a qualified privilege exists for employment communications made in good faith among people who have the same interest or duty in the subject of the communication. 240 Kan. at 8. Put differently, a statement protected by a qualified privilege must have been made in good faith by a person with a particular interest in the

8

statement to a person with the same interest in that statement and must have been limited in scope to that interest. *Dobbyn v. Nelson*, 2 Kan. App. 2d 358, 360, 579 P.2d 721, *aff'd* 225 Kan. 56, 587 P.2d 315 (1978) (adopting Court of Appeals' opinion). If a qualified privilege applies, a plaintiff must show two additional things to prove defamation: that the statement was false and that it was made with "'actual malice, that is, with actual evil-mindedness or specific intent to injure.'" *Dominguez v. Davidson*, 266 Kan. 926, 931, 974 P.2d 112 (1999) (quoting *Turner*, 240 Kan. 1, Syl. ¶ 5).

Here, the statement that Herrman claims is defamatory is Williams' email, which includes the list of 28 statements that Williams' students reported Herrman making. Does a qualified privilege apply to Williams' email, as the district court found? Yes.

First, Williams had an interest in reviewing Herrman's performance because he has an interest in ensuring his students receive quality teaching and keep up with scheduled lesson plans. Additionally, according to the evidence submitted to the court, completing performance reviews for substitute teachers was a standard practice. Herrman attempted to contest this fact, stating without referring to any evidence that performance evaluations only happened when the substitute's performance was unsatisfactory. But even if we were to accept Herrman's version, Williams was clearly dissatisfied with Herrman's performance, so it was appropriate for him to write a review.

Second, Williams sent his email to a limited number of people who shared the same interest in ensuring quality teachers: the principal, the secretary, and two other language-arts teachers. The secretary forwarded the email to two additional people: Kiehl, who managed the substitutes, and her assistant. Williams didn't further publicize the email; he simply evaluated Herrman's performance and sent the evaluation to school administrators to request that Herrman not substitute for his class in the future. Herrman doesn't claim that Williams sent the email to anyone else.

9

Third, the email itself is limited in scope to Williams' interest in making sure that his students have high-quality teachers and keep up with his teaching schedule. The email explains the problems with Herrman's performance: the students didn't complete the planned lesson, and Herrman had a series of inappropriate conversations with the students. Again, according to the evidence submitted, a substitute teacher's job is to follow the lesson plan; Herrman didn't. Herrman repeatedly claims that she tried to follow the lesson plan but that the students refused to do the work—but regardless of the reason, it's undisputed that the students didn't complete their assignments. And Williams' students and some other teachers reported Herrman's inappropriate comments to Williams; Williams' email just listed those comments. Herrman suggests that a list of 28 statements isn't "limited in scope." But the list, while long, doesn't go outside the purpose of the email: to evaluate Herrman's performance as a substitute teacher.

Fourth, there's just no evidence that Williams wrote or sent his email in bad faith. Williams and Herrman both acknowledge that they don't know each other, so we can't infer that he had a personal grudge against Herrman. Herrman suggests that the length of the email indicates that Williams wrote and sent it in bad faith. But while the list of 28 statements suggests that Williams may have been upset, it doesn't prove that he wrote the list out of some sort of bad motive. See *Turner*, 240 Kan. at 10 (evidence that defendant was upset isn't evidence of bad motive). He just didn't want Herrman to substitute for his class in the future. Herrman claims that Williams acted in bad faith because he didn't sufficiently investigate what had happened before he sent his email—he didn't contact Herrman, and he relied on his students' reports without identifying the reporting students. But Williams was under no obligation to undertake any further investigation. See *Dobbyn*, 2 Kan. App. 2d at 361 (noting that failing to discover the identity of the students who reported a librarian's discourteous conduct and failing to verify the truth of the students' reports didn't affect qualified privilege). Relying on his students' reports to evaluate Herrman's performance was well within the bounds of qualified privilege. See *Turner*, 240 Kan. at 10.

Herrman uses the word "hearsay" repeatedly, suggesting that it was unfair for Williams to base his email on what other people told him. But hearsay is a legal term—in legal proceedings, the concept relates to what kind of evidence is admissible in a trial. In everyday situations, people often rely on hearsay statements (statements not made directly to them), and a person's reliance on hearsay doesn't prevent that person from making a qualified-privilege claim.

Here, even though Williams relied on hearsay statements about what Herrman had said and done, Herrman did get to present her side of the story to the district court—she submitted an unsigned, unsworn "personal statement" with her amended petition, describing her version of what happened in the classroom on February 25, 2015. In that statement, Herrman admits to saying a lot of what the students had reported to Williams. For example, Herrman agrees that she told the students that she doesn't trust doctors or dentists, that she's a Libertarian, that she didn't have sex the way teens do today, that she's a Federalist, that she's a Catholic, that the value of a dollar is 7 cents, that she has a lot of cats, and that she had two abortions. She disputes only the context of other statements, for example her comments about the death of Eric Garner and about causes of homosexuality. And she outright disputes making some other comments, claiming she never said that girls who wear short shorts are "asking for it," that men have uncontrollable libidos, or that black people have children for welfare. But all of this phrase-by-phrase parsing is ultimately beside the point. Williams submitted an evaluation of Herrman's performance based on what his students reported to him and what other teachers confirmed. Qualified privilege applies to Williams' email: he submitted it in good faith, sent it only to people who shared his interest in providing quality teachers, and limited its scope to Herrman's performance.

Because Williams' statements were privileged, the only way he can be legally responsible for any harm that those statements caused to Herrman is if he made the

11

statements with actual malice: "'actual evil-mindedness or specific intent to injure.'" *Dominguez*, 266 Kan. at 931 (quoting *Turner*, 240 Kan. 1, Syl. ¶ 5.) And while it's not common for a court to make factual findings about a person's state of mind in a summary-judgment ruling, it can be appropriate in a defamation case involving a qualified privilege when there's absolutely no evidence of malice. See *Turner*, 240 Kan. at 8; *Lloyd v. Quorum Health Resources, LLC*, 31 Kan. App. 2d 943, 954, 77 P.3d 993 (2003); but see *Smith v. Farha*, 266 Kan. 991, 998, 974 P.2d 563 (1999) (whether defendant acted with malice to justify defamation case was sufficiently in question to preclude summary judgment).

In this case, that's our situation: there's absolutely no evidence of malice. Again, Williams and Herrman don't know each other, so there's no personal grudge here. Herrman insists that Williams' statements are simply *so* defamatory and offensive that they must stem from malice, but we cannot make that same leap. Actual malice can't be inferred from the defamatory statement itself—there must be evidence of malice that comes from somewhere else. *Dominguez*, 266 Kan. at 933-34. Herrman hasn't presented that.

So even if, as Herrman alleges, the email that Williams wrote *did* defame Herrman because the 28 statements were all taken out of context or exaggerated or oddly combined, Williams isn't legally responsible for any injury caused by that defamation. He had a qualified privilege to make those statements in a substitute-teacher evaluation that he sent only to the people who supervise or use substitute teachers (or assist those who do).

## II. *The District Judge Didn't Need to Recuse Himself.*

Herrman also argues that the district judge, Judge Kevin O'Connor, should have recused himself. We have unlimited review over recusal questions, so we won't defer to

Judge O'Connor's decision not to recuse himself. See *State v. Moyer*, 302 Kan. 892, 920, 360 P.3d 384 (2015).

There are three sources of law that provide rules on when a judge should recuse himself or herself: (1) the statutory factors set out in K.S.A. 20-311d(c); (2) the standards of the Kansas Code of Judicial Conduct; and (3) the Due Process Clause of the Fourteenth Amendment to the United States Constitution. 302 Kan. at 920. But Herrman's appellate brief doesn't argue any of these—she just says that Judge O'Connor should have recused himself because he threatened her, did not consider her arguments, and created an adversarial mood in the courtroom.

Herrman doesn't cite any legal authority to support her argument. We are free to reject arguments that are made without citation to any authority. *Manco v. State*, 51 Kan. App. 2d 733, 740, 354 P.3d 551 (2015), *rev. denied* 304 Kan. 1017 (2016). But since Herrman isn't represented by a lawyer, in the interest of fairness, we will briefly consider whether Judge O'Connor should have recused himself under each of these three standards.

First, there's a statutory standard for a judge's recusal: K.S.A. 20-311d(a) outlines how to request a different judge based on the belief "that the judge to whom an action is assigned cannot afford that party a fair trial in the action." Under this statute, a party must first file a motion for change of judge. *Moyer*, 302 Kan. at 921. Then, if the district court denies that motion, the party must file an affidavit alleging grounds set forth in the statute. 302 Kan. at 921. On appeal from a denial of a recusal motion based on this statute, we review """*the legal sufficiency of the affidavit and not the truth of the facts alleged*.""" 302 Kan. at 921 (quoting *State v. Sawyer*, 297 Kan. 902, 908, 305 P.3d 608 [2013]).

13

Here, Herrman wrote a letter to the court asking Judge O'Connor to recuse himself, which we can construe as a motion for change of judge. But after the district court denied Herrman's motion, she failed to file an affidavit outlining her reasons for recusal. Because Herrman didn't comply with the statutory procedure, we can't review Judge O'Connor's refusal to recuse on this ground. See 302 Kan. at 922 (without affidavit in the record, court must deny statutory recusal claim).

Second, the Kansas Code of Judicial Conduct provides a rule about when a judge must recuse himself or herself: "A judge shall disqualify [or recuse] himself or herself in any proceeding in which the judge's *impartiality* might reasonably be questioned." Kansas Supreme Court Rule 601B, Canon 2, Rule 2.11 (2015 Kan. Ct. R. Annot. 761).

Here, Herrman simply didn't allege any facts that reasonably suggested that Judge O'Connor couldn't be impartial. She claimed in the letter that she felt "intimidated and harassed" by the judge, felt that she had an adversarial relationship with him, and felt that the judge was "hostile and condescending and argumentative." When arguing her recusal motion in court, Herrman said she felt she could "do much better emotionally, psychologically" with another judge. But Herrman's personal response to the stress of arguing her case before Judge O'Connor isn't reason enough to suspect Judge O'Connor's ability to be impartial. When ruling against Herrman's motion, he noted that he had given Herrman the opportunity to say what she needed to say, that he had tried to explain the legal process to Herrman, and that he couldn't give Herrman any special treatment just because she wasn't a lawyer. He noted that he didn't have any ill will toward either party and that he could decide the case fairly and impartially. Despite Herrman's characterization of Judge O'Connor in her appellate brief, we have reviewed the transcripts in the record on appeal, and they simply don't support a finding that Judge O'Connor couldn't be impartial.

Third, a judge must recuse himself or herself under the Fourteenth Amendment's Due Process Clause when he or she is actually biased or there is a constitutionally intolerable probability of actual bias. *Moyer*, 302 Kan. at 925-26. But there's simply no evidence that Judge O'Connor was *actually* biased in this case. He did deny Herrman's summary-judgment motion, but adverse rulings aren't sufficient grounds to require recusal. See *Smith v. Printup*, 262 Kan. 587, 608, 938 P.2d 1261 (1997).

We affirm the district court's judgment.