**V.C. VIDEO, INC., et al., Plaintiffs,**

v.

**NATIONAL VIDEO, INC., Defendant.**

**Civ. A. No. 88–1036–T.**

United States District Court,
D. Kansas.

Nov. 29, 1990.

Arthur H. Davis, Busch, Johnson, Davis, Wirth & Mank, Wichita, Kan., for plaintiffs.

James M. Armstrong, Foulston & Siefkin, Wichita, Kan., for defendant.

## MEMORANDUM AND ORDER

THEIS, District Judge.

This matter is before the court on defendant's motion for summary judgment (Doc. 29). The court does not believe oral argument would be of material assistance and therefore denies the parties' requests for argument.

Plaintiffs, former franchisees of Popingo Video, Inc. ("Popingo"), contend that defendant National Video, Inc. ("National") wrongfully interfered with the plaintiffs' contracts with Popingo. Plaintiffs additionally contend that defendant is in breach of the franchise agreement between plaintiffs and defendant as successor in interest to Popingo, and that defendant converted to its use and benefit certain advertising and royalty fees paid by plaintiffs to Popingo. The parties have stipulated that the law governing this case is common law concerning interference with contractual relations, conversion, and breach of contract. Pretrial Order, Doc. 34.

Plaintiffs' contentions, as contained in the Pretrial Order, are as follows:

Plaintiffs contend that on April 19, 1986, Defendant entered into a Purchase Agreement with Popingo Video, Inc. and its President, Byron Boothe. Prior to that date there was an existing franchise agreement between plaintiffs and Popingo Video, Inc. This agreement obligated Popingo Video, Inc. and its President, Byron Boothe to develop, use and control the "Popingo System", relating to the establishment and operation of stores specializing in the sale and rental of prerecorded video cassette tapes, video cassette players and recorders, accessories and related consumer electronic equipment, and certain food and promotional

items. Each Plaintiff paid money to Popingo Video, Inc. for its franchise rights.

The agreement of April 19, 1985 [sic], contractually obligated Popingo Video, Inc. and its President, Byron Boothe to breach its obligation to Plaintiffs to develop, use and control the "Popingo System". Popingo Video, Inc. has ceased all business activity and is a defunct Kansas corporation. The Defendant did further employ Byron Boothe and other key members of the "Popingo System", thereby preventing them from utilizing any of their talents and skills to promote the "Popingo System".

Plaintiffs alternatively contend that the agreement of April 19, 1986, constitutes a merger and National Video, Inc. is the successor in interest to all the obligations of the franchise agreements existing between Plaintiffs and Popingo Video, Inc. Defendant has breached its contractual obligations to Plaintiffs by refusing to allow Plaintiffs to convert to the "National System". Defendant is liable to Plaintiffs for the conversion of advertising and royalty fees paid by Plaintiffs to Popingo Video, Inc.

Doc. 34, pp. 4–6. Plaintiffs' theories of recovery are tortious interference with plaintiffs' franchise agreements with Popingo; breach of contract based on National's failure to allow plaintiffs to convert from Popingo franchisees to National Video franchisees; and conversion of advertising and royalty fees paid to Popingo.

The court is familiar with the standards governing the consideration of a motion for summary judgment. The Federal Rules of Civil Procedure provide that summary judgment is appropriate when the documentary evidence filed with the motion "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A principal purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The court's inquiry is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The burden at the summary judgment stage is similar to the burden of proof at trial. The court must enter summary judgment, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact on its claim. Rule 56, however, imposes no requirement on the moving party to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323, 106 S.Ct. at 2553 (emphasis in original). Once the moving party has properly supported its motion for summary judgment, the nonmoving party may not rest upon mere allegations or denials, but must set forth specific facts showing a genuine issue for trial, relying upon the types of evidentiary materials contemplated by Rule 56. Fed.R.Civ.P. 56(e). Each party must demonstrate to the court the existence of contested facts on each claim it will have to prove at trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. The court reviews the evidence on summary judgment under the substantive law and based on the evidentiary burden the party will face at trial on the particular claim. *Anderson*, 477 U.S. at 254, 106 S.Ct. at 2513.

For the purposes of the motion for summary judgment, the following facts are uncontroverted.

1. Popingo Video, Inc., a Kansas corporation, was formed in the spring of 1984, and did business as a franchisor of video tape rental stores. Each of plaintiffs became a Popingo franchisee and operated video tape rental stores under the Popingo logo. Plaintiff VTR, Inc., acquired a Po-

pingo franchise for a Hutchinson, Kansas store in July 1984. Plaintiff Manhattan Video, Inc., acquired a Popingo franchise for a Manhattan, Kansas store in October 1984. Eric Hardman, who later incorporated plaintiff Penny Lane Video, Inc., acquired a Popingo franchise for a store in Junction City, Kansas in October 1984, and transferred his interest to plaintiff Penny Lane in October 1985. Plaintiff Video 84, Inc., acquired Popingo franchises for stores in Hays, Kansas, Pratt, Kansas, and other "outpost" locations in November 1984. A partnership that was a predecessor of plaintiff V.C. Video, Inc., acquired Popingo franchises for stores in Arkansas cities in early 1985, and V.C. Video, Inc., later bought Popingo-owned stores in Newton, Kansas and Great Bend, Kansas in early 1986. Plaintiff K.L. Harris, Inc., acquired what had previously been a Popingo-owned video store in Derby, Kansas in early 1986. Each of the plaintiffs except V.C. Video, Inc., had stores within the exclusive territory granted by defendant National Video, Inc., an Oregon corporation, to one or more of National's existing franchisees; plaintiff V.C. Video was later deemed to have a territorial conflict because of its common ownership and management with plaintiff K.L. Harris, Inc.

2. Within six or seven months of its formation, Popingo was experiencing tremendous cash drains. Although Popingo and National, the nation's largest video franchisor, had some discussions about a merger, and although Popingo announced a prospective merger with National, no merger (in the corporate law sense of a stock transaction between corporations, with only one corporation surviving) ever took place. As Popingo's financial difficulties worsened, National did not want to merge with Popingo, since Popingo had an overdue two million dollar note that National did not want to assume.

Plaintiffs have attempted to dispute defendant's statement regarding Popingo's financial status. Plaintiffs rely on the National Video Preliminary Prospectus dated September 5, 1986. Exh. 1 to Doc. 36. As of December 31, 1985, Popingo had on hand current assets of $1,777,455. For the same

fiscal year, Popingo generated revenues of $6,520,025. Other data contained in the prospectus supports National's contention that Popingo was in a difficult financial situation. At the end of 1985, while Popingo had total current assets of $1,777,455, total current liabilities were $3,018,222. Further, while Popingo's 1985 total revenues totalled $6,520,025, total costs and operating expenses for 1985 were $7,553,684. Popingo's 1985 operating losses were $1,033,659. Popingo's losses from its first eight months of operations (May 1, 1984–December 31, 1984) were $201,061. The auditors noted that Popingo was in default on a $2,000,000 note as of the end of 1985. It thus appears uncontroverted, from the matters before the court, that Popingo was indeed in a difficult financial situation.

3. Because of Popingo's difficult financial situation (caused in part by the fact that many of its franchisees faced economic difficulties of their own and were not paying their monthly franchise fees), Popingo's ability to fulfill its obligations was limited, and it had cut down on operations, personnel, advertising, and all other support services. By early 1986 Popingo had determined that it could not generate sufficient future revenues to continue its operation. Popingo had not had adequate cash flow to operate for the previous six to eight months and had survived because its chief stockholder, Byron Boothe, personally infused cash into the company. National understood that Popingo did not have the financial ability and did not intend to continue its operations as a franchisor, and that Popingo intended to place those franchisees who could not be converted to the National system with another franchisor.

While plaintiffs attempted to controvert defendant's statement of facts, they have failed to come forward with evidence of record to support any factual dispute. Popingo's 1985 revenues were $6,500,000; however plaintiffs fail to point out the operating expenses and loss for that same period. It is immaterial whether Popingo was actively involved in acquiring other franchisors, as indicated in the published

booklet summarizing the February 1986 franchise meeting. Exh. 2 to Doc. 36.

4. In late March 1986, Popingo representative Larry Schauf announced to the Popingo franchise council, a group of franchisee representatives that included Tom Harris, Eric Hardman, and Bill Kuhn, who were involved in the ownership and/or management of four of the plaintiffs (V.C. Video, Inc., Penny Lane Video, Inc., K.L. Harris, Inc., and Video 84, Inc.), that negotiations with National had not been successful. The franchise council assumed that Popingo was going to sell its franchises, and did not want it to sell to a "fly-by-night operation," but preferred that any transaction be with a strong, large, viable national franchisor; it therefore resolved to urge Popingo to continue its negotiations with National.

5. On April 19, 1986, after extended negotiations, Popingo and National entered into a written contract, or "Purchase Agreement." The Purchase Agreement, which was announced at a Popingo franchisees' meeting a few days later consists of 22 typewritten pages, together with several hundred pages of supporting schedules. At about the same time Popingo and its President, Byron Boothe, executed Noncompetition Agreements in favor of National.

Plaintiffs did not dispute these facts, but do attempt to "clarify" them. Plaintiffs refer to a letter from Byron Boothe to all Popingo franchisees, dated April 27, 1986, in which Boothe refers to a "merger" between the Popingo video franchise system and National Video, Inc. Exh. 3 to Doc. 36. Boothe's characterization of the transaction as a merger does not alter the nature of the transaction.

6. The Popingo assets conveyed to National under the terms of the Purchase Agreement were: (1) Popingo's rights in Popingo franchise agreements whose franchisees agreed to operate under the National logo and which did not involve territorial conflicts with existing National franchises

(Section 3.1); (2) Popingo's rights in Popingo franchise agreements where territorial conflicts had, in the discretionary judgment of National, been satisfactorily resolved (Section 3.2); (3) approximately $300,000 in Popingo accounts receivable (specifically not including any Popingo advertising account funds) (Section 7.2) and not including any royalty fees previously paid; and (4) that part of the Popingo advertising account funds attributable to Popingo franchisees who had converted to National (Section 8.8.2). The agreement also obligated Popingo to contribute $100,000 plus the first 50,000 shares of National stock issued to Popingo under the agreement to a conversion fund to be used to resolve territorial conflicts or to defend lawsuits by franchisees. Upon termination of the fund its remaining contents were to be distributed (and were distributed) to Popingo. Sections 3.3, 6.1–6.4. Only 69 or 70 Popingo-franchised stores (about one half of the Popingo stores that had opened) were eventually converted under the Purchase Agreement to the National system.

Plaintiffs have attempted to controvert this statement of fact. Plaintiffs state, without support from the record, that National and Popingo intended the purchase by National of Popingo. Plaintiffs further assert that other corporate assets were conveyed, including Popingo's licensing rights, its trademarks and service marks, which Popingo could not sell to any new prospective takeover candidate (Section 8.12) and the company-owned stores, which had to be converted to National stores or sold within 180 days. Section 8.9. To the extent that these matters can be considered assets conveyed to National in the transaction, these facts do not materially alter the nature of the transaction as set forth by National.

7. The National assets transferred to Popingo under the Purchase Agreement were: (1) up to 250,000 shares of National stock (Section 3.3) [1]; and (2) 60 National standard form franchise agreements, each

---

1. Because fewer Popingo stores were actually converted to the National System than contemplated in the agreement, only 155,000 shares of National stock were actually transferred to Popingo.

permitting Popingo to operate a single video store. Section 7.1. The agreement also obligated National to contribute $50,000 to the conversion fund. Section 6.2.

8. In the Purchase Agreement, Popingo specifically warranted to National that Popingo had the right to assign all its interest in the franchise agreements to National, that all the franchise agreements were in effect, that Popingo was not in default under those agreements, and that none of the various franchise fees previously received by Popingo were or might in the future be subject to a claim of refund by any of the franchisees. Sections 4.1–4.2. Popingo also warranted that the Popingo advertising funds had been used in accordance with the Popingo franchise agreements. Section 4.10. The agreement explicitly provided that National did not assume or accept responsibility for any of Popingo's liabilities, excepting its obligations under any assigned franchise agreements. Section 3.4.

Plaintiffs attempt to dispute this statement of facts, stating that National was aware of the plaintiffs' contractual agreements with Popingo and what the purchase would mean to Popingo's ability to honor those contractual duties. Plaintiffs note that National had contractual obligations with its own franchisees. The agreement specifically provided that National would continue to honor these obligations, including the obligation to protect the exclusive territories of National franchisees. Section 3.1. Plaintiffs further state that "National required a clause of indemnification in recognition of the impending breach that would occur."

In reply, National admits that it was aware of plaintiffs' contracts with Popingo; it knew how the Purchase Agreement would affect Popingo's ability to perform (that the agreement had no effect on Popingo's relationship with its non-converting franchisees); it was contractually obligated to preserve the exclusive territories of its own franchisees (this was the reason for not taking over Popingo franchises with territorial conflicts); and it was granted broad indemnification rights against Popin-

go. National again notes (see also fact ¶ 6) that National returned the indemnification fund to Popingo. The court does not find a genuine issue of material fact based on the matters asserted by plaintiffs.

9. In making the Purchase Agreement with Popingo, National did not intend for Popingo to breach its contracts with its franchisees. The Popingo Noncompetition Agreement acknowledged that Popingo was currently involved in activities that would violate its promise not to compete with National by involving itself in any video business except through National or as a National franchisee, and specifically permitted Popingo to continue that ongoing competition with National without being in breach of the agreement. Popingo Noncompetition Agreement, Section 3. That Noncompetition Agreement provided in relevant part:

> [National] acknowledges that the undersigned [Popingo] is currently involved in activities which would violate this Agreement, such current activities shall not be deemed a violation hereof provided that [Popingo] uses its best efforts to expeditiously discontinue such activities.

*Id.* A similar provision appears in the Noncompetition Agreement of Byron Boothe. The Purchase Agreement did not assign to National that portion of the Popingo advertising funds attributable to Popingo franchisees that did not convert, and required National to return to Popingo any receivables or collections related to any franchise agreements not assigned to National under the agreement. Sections 3.2.3, 8.8.2.

Plaintiffs assert that this statement of facts is disputed. Plaintiffs state, without any authority from the record, that National intended a merger of the two systems and an end to Popingo. Plaintiffs further assert that there was no real intention on the part of Popingo to continue to operate the system. Plaintiffs conclude that Popingo had no intention of fulfilling its contractual duties to plaintiffs. Popingo's intent, however, is not at issue here.

In reply, National states that it agrees that Popingo did not intend to continue to operate its franchise system, at least not

for long. *See* Noncompetition Agreement, Exh. C to Doc. 30 (requiring Popingo to use its best efforts to expeditiously discontinue competition with National). The facts as set forth by National are not controverted.

10. Neither National nor Popingo intended that Popingo would indefinitely continue to operate a video franchise system in competition with National. The Noncompetition Agreement required Popingo to make its "best efforts to expeditiously discontinue" such competition. Noncompetition Agreement, Section 3, Exh. C to Doc. 30. The standard Popingo franchise agreement expressly provided that Popingo could transfer or assign any or all of its rights or obligations under the franchise agreement to any third party. *See* Exh. B to Doc. 30. In a letter dated November 21, 1986, after it became clear that plaintiffs' stores would not be converted to National's system because of territorial conflicts, Popingo wrote to at least some of the plaintiffs, stating, "If you prefer to continue as a part of a viable franchise system, even though [you] have not been able to convert to National Video, we will pursue favorable terms on your behalf with other franchisors for the conversion of your store to their franchise system." (T. Harris depo. p. 96).

Plaintiffs attempt to dispute this paragraph of facts, stating that no efforts were made to join plaintiffs with another franchise system. Plaintiffs have provided no support for this assertion. Plaintiffs believe that they were abandoned by Popingo. However, Popingo is not the defendant here. Plaintiffs do not allege nor have they provided the court with anything to indicate that National had a duty under the Purchase Agreement or otherwise to help them convert to some other franchise system.

## I. Conversion

According to the Pretrial Order, plaintiffs contend that National converted certain advertising and royalty fees paid by plaintiffs to Popingo. Doc. 34. Under Kansas law, conversion is defined as an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another. *Temmen v. Kent–Brown Chevrolet Co.*, 227 Kan. 45, 50, 605 P.2d 95 (1980). An action will not lie for conversion of a debt. When there is no obligation to return identical money, but only a relationship of debtor and creditor, an action for conversion of the funds representing the debt will not lie against the debtor. *Id.* In their response to defendant's motion for summary judgment, plaintiffs concede that defendant did not convert any monies paid by plaintiffs to Popingo. Doc. 36, at 8. Further, the record before the court provides no factual basis for such a claim. Summary judgment is therefore appropriate on plaintiffs' conversion claim. Plaintiffs assert in their response brief that defendant converted certain intangible personal property such as the right to use the Popingo trademarks and servicemarks. That claim is not, however, contained in the Pretrial Order; further, there is no factual support in the record for such a claim. The contract did not restrict plaintiffs' use of the Popingo trademarks and servicemarks, but did restrict Popingo from licensing the marks to parties other than current Popingo franchisees. Section 8.12. To the extent plaintiffs' conversion claim hinges upon a showing that Popingo and National merged, that issue will be discussed in the next section.

## II. Merger/Breach of Contract

Plaintiffs' claim in the Pretrial Order is based on National's failure to allow plaintiffs to become National franchisees. Plaintiffs have no rights under the National/Popingo Purchase Agreement to become National franchisees. The contract between National and Popingo did not require National to accept plaintiffs because (as the uncontroverted facts show) plaintiffs had territorial conflicts with existing National franchisees. The Purchase Agreement required National to accept those franchisees who did not have territorial conflicts and those franchisees whose territorial conflicts had, in the discretionary judgment of National, been satisfactorily resolved. Sections 3.1–3.2. National was not contractually obligated to take any ac-

tion with respect to plaintiffs' franchises and cannot be in breach.

■ Plaintiffs alternatively contend in the Pretrial Order that a merger between National and Popingo occurred and that National therefore succeeded to Popingo's rights and obligations under the franchise agreements with plaintiffs. It is uncontroverted that no statutory merger occurred. The court will therefore address whether a de facto merger occurred.

The general rule on the liability of a successor corporation for the debts of its predecessor was stated in *Comstock v. Great Lakes Distributing Co.*, 209 Kan. 306, 496 P.2d 1308 (1972):

> Generally where one corporation sells or otherwise transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the transferor, except: (1) where the purchaser expressly or impliedly agrees to assume such debts; (2) where the transaction amounts to a consolidation or merger of the corporation; (3) where the purchasing corporation is merely a continuation of the selling corporation; and (4) where the transaction is entered into fraudulently in order to escape liability for such debts.

209 Kan. at 310, 496 P.2d 1308; *see also Kansas Commission on Civil Rights v. Service Envelope Co.*, 233 Kan. 20, 25, 660 P.2d 549 (1983); *Stratton v. Garvey International, Inc.*, 9 Kan.App.2d 254, 262, 676 P.2d 1290 (1984); *Schmid v. Roehm GmbH*, 544 F.Supp. 272, 277 (D.Kan.1982). Plaintiffs argue that the transaction between National and Popingo was a de facto merger. The court may examine a number of factors to determine whether a transaction is a de facto merger:

> (1) continuity of the business enterprise between the buyer and the seller, including continuity of management, employees, location, and assets; (2) continuity of shareholders, meaning the shareholders of the seller become the shareholders of the buyer; (3) the seller ceases operations and dissolves soon after the transfer; and (4) the buyer assumes those liabilities and obligations necessary for the uninterrupted continuation of the seller's business.

*Wessinger v. Vetter Corp.*, 685 F.Supp. 769, 773 (D.Kan.1987) (applying Illinois law); *see also* 19 Am.Jur.2d *Corporations* § 2719 (1986) (same four factors).

(a) Assets transferred: Popingo transferred some, but not all, of its assets to National. Only about half of Popingo's franchises and a comparable portion of advertising account funds were transferred to National. Other assets transferred included approximately $300,000 in accounts receivable. Section 7.2. The court is unaware of any authority for holding that a de facto merger occurred when only part of the assets of the transferor corporation were transferred. *See Comstock v. Great Lakes Distributing Co.*, 209 Kan. 306, 496 P.2d 1308 (1972) ("Generally where one corporation sells or otherwise transfers *all* of its assets to another corporation, the latter is not liable for the debts and liabilities of the transferor, ...."). The court will, however, examine other factors to determine whether a de factor merger occurred.

(b) Continuity of ownership of Popingo: National stock was given as consideration for the transfer of assets. The Purchase Agreement provided that National was to issue up to 250,000 shares of National voting common stock to Popingo. Section 3.3. A total of 155,000 shares of National stock were transferred to Popingo. According to the Purchase Agreement, a total of 1,918,420 shares of voting common stock were outstanding as of the date of the contract. Section 5.3. There is no evidence to indicate that this stock was distributed to Popingo's shareholders. Other consideration was received by Popingo in the transaction, including 60 National franchise agreements, each permitting Popingo to operate a National video store. Section 7.1.

(c) Continuation of Popingo's enterprise: Pursuant to the Purchase Agreement, National was to request the full-time service of up to three of Popingo's employees for not longer than sixty days to provide transition services to National. Section 8.7. There has been no evidence presented to indicate whether these employees were in

fact carried over. Also pursuant to the Purchase Agreement, Popingo President Byron W. Boothe and Kenneth H. Koger (whose relationship with Popingo is not clear from the record) were to be elected to National's board of directors at the next shareholder meeting. Section 8.5. There is no evidence on whether any other personnel were carried over into National. The former Popingo franchisees who are now National franchisees are apparently continuing with their businesses as before the change but under the National name.

(d) Status of Popingo following the transfer of assets: The Purchase Agreement did not require that Popingo be dissolved. Popingo did not dissolve soon after the transfer. Popingo was not dissolved prior to the commencement of this action. Popingo was still a corporation in good standing as of March 20, 1989. *See* Exh. B to Doc. 37 (certificate of Secretary of State). The court is unaware of whether Popingo has ceased all business activity; however, Popingo, the transferor corporation, is apparently still in existence. After the asset transfer, Popingo was not a "mere shell." The asset transfer left Popingo with about half of its franchises, which it could have sold to a different video franchisor. The asset transfer also left Popingo with 155,000 shares of National stock and 60 National franchise agreements.

(e) Assumption by National of Popingo's liabilities necessary for the continuation of normal business operations of Popingo: Under the Purchase Agreement, National assumed none of Popingo's liabilities, except for Popingo's obligations under the assigned franchise agreements. Section 3.4.

(f) Absence of other potential defendants: Popingo is apparently still in existence and may be sued.

(g) National's deliberate avoidance of statutory merger requirements: Several reasons for constructing the transaction as an asset purchase are apparent from the record. Popingo was in default on a $2,000,000 note that National did not want to assume. National had franchisees in the same territories as some of the Popingo franchisees. National could not have accepted all of Popingo's franchisees without breaching the exclusivity provisions in National's franchise agreements with its own franchisees. It may be inferred that National deliberately avoided a statutory merger.

After considering the terms of the contract and the uncontroverted facts, the court concludes that the transaction in question does not constitute a de facto merger. National merely purchased a portion of Popingo's assets. National is not liable for Popingo's debts and liabilities to the plaintiffs under the franchise agreements between plaintiffs and Popingo.

## III. Tortious Interference with Contract

■ Kansas law recognizes that a party who, without justification, induces or causes a breach of contract is liable for the resulting damages. *See Turner v. Halliburton Co.*, 240 Kan. 1, 12, 722 P.2d 1106 (1986); *Batt v. Globe Engineering Co.*, 13 Kan.App.2d 500, 507, 774 P.2d 371 (1989); *United Automobile Workers v. Cardwell Manufacturing Co.*, 416 F.Supp. 1267, 1289 (D.Kan.1976). Kansas generally follows the test set forth in the Restatement (Second) of Torts § 766, which provides:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*Tomson v. Stephan*, 696 F.Supp. 1407, 1415 (D.Kan.1988) (quoting Restatement (Second) of Torts § 766).

The elements of tortious interference with contract are: (1) the existence of a contract between the plaintiff and a third party; (2) actual or constructive knowledge of the contract by the defendant; (3) intentional acts by defendant inducing the third party to breach the contract with plaintiff; (4) such acts constituting the proximate

cause of the breach; and (5) damages suffered by plaintiff as a direct result of defendant's actions. *Professional Investors Life Insurance Co. v. Roussel,* 528 F.Supp. 391, 397–98 (D.Kan.1981). The tort of interference with contractual relations requires proof that National induced Popingo to breach its contracts with plaintiffs. *See Reazin v. Blue Cross & Blue Shield of Kansas, Inc.,* 663 F.Supp. 1360, 1491 (D.Kan.1987), *aff'd,* 899 F.2d 951 (10th Cir. 1990).

Not all interference with contractual relations is tortious; malice is required. *Reazin,* 663 F.Supp. at 1492 (citing *Turner v. Halliburton Co.,* 240 Kan. 1, 12–13, 722 P.2d 1106 (1986)). In determining whether an actor's conduct in intentionally interfering with a contract is improper, the following factors should be considered:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference, and

(g) the relations between the parties.

*Turner,* 240 Kan. at 14, 722 P.2d 1106 (quoting Restatement (Second) of Torts § 767).

Several elements of the claim of tortious interference are met in the present case. A franchise contract did exist between each of the plaintiffs and Popingo. It is uncontroverted that National had actual or constructive knowledge of these franchise contracts. Defendant argues that plaintiffs cannot establish two of the elements of their tortious interference claim: causation and malice.

The court agrees with National that plaintiff cannot show causation. There is no evidence that National induced or caused Popingo to breach its franchise agreements with plaintiffs. There is nothing in the National/Popingo Purchase Agreement which required Popingo to breach its franchise agreements with plaintiffs. Nor have plaintiffs pointed to any conduct of National which can be seen as an inducement or cause of any breach of contract by Popingo. (The court notes that the record is noticeably devoid of any discussion of what breaches of contract Popingo may have committed.)

The noncompetition agreement authorized Popingo to continue to compete with National for a period of time—i.e., allowed Popingo to continue to honor its obligations under the franchise agreements with plaintiffs—while it "expeditiously discontinue[d]" such competition. The Purchase Agreement did not require Popingo to immediately cease its operations with its franchisees.

Popingo had the right under the franchise agreements to assign those agreements to another video franchisor. Popingo could have done so without being in breach of its franchise agreements with plaintiffs. That Popingo failed to take any action whatsoever may be a breach of its franchise agreements with plaintiffs. There is no evidence, however, that National participated in any way in Popingo's actions.

It is uncontroverted that in the period of time between Popingo's formation and its transaction with National, Popingo lost a significant amount of money. Prior to the transaction with National, Popingo was experiencing difficulties meeting its obligations to its franchisees due to its financial situation. By early 1986 Popingo had determined that it could not generate sufficient future revenues to continue its operation. It is uncontroverted that Popingo was in financial difficulties; however, it would be mere speculation to consider how long Popingo would have been able to remain in business absent the transaction which occurred.

Plaintiffs have failed to come forward with any evidence that any act National took constituted the proximate cause of Popingo's breach of contract. The Purchase Agreement and noncompetition agreement did not interfere with plaintiffs'

contract rights with Popingo. Summary judgment is therefore appropriate.

IT IS BY THE COURT THEREFORE ORDERED that defendant's motion for summary judgment is hereby granted. The Clerk is directed to enter judgment in favor of defendant and against plaintiffs.