**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 15, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

PITT VESOM, M.D.,

　　　　　Plaintiff - Appellant,

v.

ATCHISON HOSPITAL
ASSOCIATION; RYAN THOMAS,
M.D.; DOUGLAS GORACKE, M.D.;
DONALD SWAYZE, D.O.,

　　　　　Defendants - Appellees.

No. 06-3353

D. Kan.

(D.C. No. 04-CV-2218-JAR)

## ORDER AND JUDGMENT[*]

Before **O'BRIEN**, **BRORBY**, and **GORSUCH**, Circuit Judges.

Dr. Pitt Vesom sued the Atchison Hospital Association and several

individual members of the Atchison Hospital Medical Executive Committee when

they refused to recommend his medical staff privileges be renewed. Dr. Vesom

appeals from summary judgment granted in favor of the defendants. We

AFFIRM.

---

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

# I. BACKGROUND

Dr. Vesom is an American citizen born in Thailand. He maintained medical staff privileges at the Atchison Hospital in Atchison, Kansas, for a substantial period between 1983 through 2003. In 2003, the Association refused to renew his staff privileges, allegedly because he was a "disruptive physician." Vesom sued the Atchison Hospital Association and three individual physicians (collectively, the Hospital), claiming race discrimination under 42 U.S.C. § 1981 and Title VI; conspiracy under 42 U.S.C. § 1985(3); antitrust violations under section 1 of the Sherman Act, 15 U.S.C. § 1; and claims alleging retaliatory discharge and intentional interference with contract under Kansas law.

## A. Hospital Bylaws

Atchison Hospital Association is a not-for-profit corporation formed in 1912. Governed under Kansas law, the Association's purpose is to provide quality health care and medical services for the citizens of Atchison and the surrounding area.[1] To admit and treat patients at the Hospital, a doctor must be an active member of the medical staff. In turn, the physicians and dentists on the medical staff work under the Medical Staff Bylaws which "establish the mechanisms to carry out the direct and delegated responsibilities of the Medical Staff in cooperation with the Hospital Administration and the Governing Board." (R. Vol. II at 493.) The "Governing Board" is the Board of Directors which has

---

[1] Atchison is a community of approximately 12,000 people.

"the ultimate responsibility for the operation of the Hospital and for providing patient care." (*Id.*)

The medical staff elects officers to the Medical Executive Committee (MEC). The MEC is comprised of the Chief of Staff, the Vice Chief of Staff, the Secretary/Treasurer, the immediate past Chief of Staff and one "member at large" elected from the active medical staff. According to the Bylaws, the MEC oversees the functions of the medical staff and acts on their behalf, but its authority is limited to "making recommendations to the Governing Board;" and its "actions are not binding until approved by the . . . Board." (*Id.* at 499.)

The MEC's duties include, among others, recommending the acceptance or rejection of an application for medical staff privileges or an application for renewal, required every two years. Once accepted, there is no guarantee staff privileges will be renewed solely because the professional is licensed to practice in Kansas. Only those who meet and maintain the qualifications, standards and requirements of the applicable rules and regulations will be accepted for renewal of staff privileges.

Should the MEC recommend a practitioner's privileges not be renewed, the Bylaws provide a system to challenge the adverse decision. The practitioner must be given written notice containing a statement of the reasons for the action and a description of fair hearing rights. The practitioner can request a hearing before a Fair Hearing Committee consisting of not less than five disinterested outside

physicians.

The MEC, the Governing Board and the practitioner may each have legal counsel at the hearing. All parties have the right to offer oral and documentary evidence and to cross-examine the witnesses. According to the defendants, the Fair Hearing Committee is permitted to conduct independent interviews, research and review. It then must issue a report of its findings and recommendations to the Chief Executive Officer (CEO), who forwards the report to the practitioner and the other members of the Board.

Within ten days of receiving the report, the practitioner may request appellate review by the Board on actions of the Hearing Committee "taken arbitrarily, capriciously or with bias" or "not supported by the evidence." The review is limited to the record presented to the Fair Hearing Committee. The Board then issues a final decision.

B. Dr. Vesom's History with the Hospital[2]

Dr. Vesom, a Board Certified internist and cardiologist, was granted privileges at the Hospital in September, 1983. With the exception of a few colleagues, Vesom was excluded from the staff members' social events and activities. Although Vesom was "highly qualified," the majority of the staff members routinely refused to refer their cardiac patients to Vesom's care. (R.

---

[2] The facts are set forth in the light most favorable to Dr. Vesom. *See Stover v. Martinez,* 382 F.3d 1064, 1070 (10th Cir. 2004).

Vol. III at 1279.) His wife, a certified pathologist, was unable to find employment with Atchison Hospital.

Dr. Vesom was the Chairman of at least one service section (primarily emergency services) from 1985 through 1995. In 1986, 1987 and 1991, he was a member of the MEC. In June 1996, Dr. Vesom voluntarily resigned and sold his medical practice to be with his family in Thailand.[3] He returned to Atchison in 1998 and requested reappointment. The MEC recommended he not be reappointed and Vesom requested a fair hearing pursuant to the Bylaws.[4] The Governing Board eventually chose not to follow the MEC recommendation and approved Vesom's conditional reappointment upon his approval of an "Agreement and Release." (R. Vol. III at 1026.) The Agreement provided a one-year provisional appointment with proctoring by an independent cardiologist and written reports of his behavior from specific Hospital departments.[5] Vesom also stipulated to a provision recognizing a concern Vesom may engage in future disruptive behavior:

> During his tenure on the Medical Staff, Dr. Vesom shall enjoy all the
> rights and privileges and be subject to all the rules, restrictions and

---

[3] The purchasing group, Mid-America Cardiology Associates, continues to provide cardiology services in Atchison.

[4] In 1998, the MEC was composed of Dr. Goracke (Chief of Staff), Dr. Campbell, Dr. Sontheimer, Dr. Shriwise and Dr. Eplee.

[5] The departments included Social Services, Nursing, Emergency Room and the Intensive Care Unit.

sanction as may be granted or imposed by the Bylaws upon any physician on the Medical Staff, including but not limited to, any and all section thereof governing or relating to "Disruptive Physicians."

(R. Vol. III at 1030.) Vesom's next reappointment request in 2001 was approved without incident and he was granted privileges for two years.

In December 2002, Vesom submitted a Reappointment Information Form and other documents for his 2003 reappointment. Each renewal packet included an Authority and Liability Waiver which states:

> I further waive any rights under Educational Rights and Privacy Act or any statute granting immunity to such Boards or Committees and further agree to hold harmless such President, Board or Committees evaluating my application from any claim or action by or on my behalf in the event such application for reappointment is denied for any reason.

(R. Vol. II at 565.) At the time Vesom applied for renewal of his privileges, the MEC consisted of Dr. Goracke (Chief of Staff), Dr. Swayze (Vice Chief of Staff), Dr. Jones (Secretary/Treasurer), Dr. Rider (member at large), and Dr. Thomas (past Chief of Staff).

Shortly before the MEC met to consider Vesom's renewal application, he and two other staff physicians, Dr. Ware and Dr. Tayiem, made complaints regarding the Hospital's peer review process concerning one of Dr. Thomas' patients.[6] On January 3, 2003, these three doctors met with Dr. Goracke and the

---

[6] Dr. Tayiem is a Palestinian physician who joined in the complaints regarding the peer review process. Tayiem remains in active status at the hospital and was a member of the MEC during the discovery period.

CEO of the Hospital, Virgil Bourne, to discuss their complaints. On January 22, 2003, Vesom, Ware and Tayiem sent their complaints in a letter to the Board of Directors of the Hospital. One day later, a special meeting of the Board was convened to discuss "pressing medical staff issues." (R. Vol. III at 1177.) In attendance were Board members Bourne, Goracke and the Hospital's legal counsel, Andrew Ramirez. The only action taken was to terminate the Hospital's agreement with Dr. Ware.

C. Denial of Privileges

In February 2003, the MEC met and determined it would recommend Dr. Vesom's renewal of privileges be denied and Ware's provisional privileges be terminated. Eventually, the reasons given for denial were based on the "disruptive physician" provisions of the Bylaws. These provisions prohibit:

1.      attacks (verbal or physical) leveled at individuals, Hospital personnel or patients which are personal, irrelevant or go beyond the bounds of fair professional conduct;

. . .

3.      non-constructive criticism addressed to its recipient in such a way as to intimidate, undermine confidence, belittle or imply stupidity or incompetence;

4.      refusal to accept Medical Staff assignments, or to participate in committee or departmental affairs on anything but his or her own terms or to do so in a disruptive manner;

. . .

7.      verbal or physical threats of retribution, litigation or violence directed at individuals, Hospital personnel or patients; or

8.      use of foul, abusive language.

(R. Vol. I at 150-51.) On February 18, 2003, Bourne sent Drs. Vesom and Ware identical letters notifying them of the MEC's adverse recommendation based on the conclusion they were disruptive physicians. On February 24, 2003, Goracke, Bourne and Ramirez met with the Board. The minutes of this meeting state:

> The Executive/Credentials Committee further informed the Board of their recommendation to give David Ware . . . notice of Termination of Provisional Active Staff Status and Privileges effective March 18, 2003. They also informed the Board of their recommendation to notify Pitt Vesom . . . of Termination of Active Staff Privileges effective March 18, 2003.

(Vol. III at 1179.) The Board then met in executive session with the Hospital's attorney and the risk manager.

Vesom requested a Fair Hearing on March 6, 2003. Bourne responded with a letter delineating the specific charges made against Dr. Vesom, an itemized listing of the information used by the MEC in reaching its recommendation (Vesom's Credentials File), and the witnesses expected to testify in support of the charges. Vesom claims it was at this time he realized the MEC would present alleged instances of disruptive conduct but would not include exculpatory information and documents. Prior to the Fair Hearing, he was provided with copies of all the written exhibits that would be used to support the charges. The hearing ultimately took place on January 24, 2004. Both the Hospital and Vesom were represented by attorneys and both parties were permitted to offer testimony

and evidence in support of their positions. The Fair Hearing Committee, a panel of five independent doctors, was allowed to ask questions of their own. Understanding its role was to determine whether the MEC's decision was "arbitrary, unreasonable or capricious," the Fair Hearing Committee unanimously determined the evidence demonstrated Vesom had exhibited a "pattern of disruptive behavior." (R. Vol II at 731, 739.) Vesom requested appellate review before the Board, which took place on March 25, 2004. The Board affirmed the decision of the Fair Hearing Committee and the MEC on April 2, 2004.

Throughout the appeal process, Dr. Vesom maintained active medical staff privileges at the Hospital. Afterward, he obtained privileges at Cushing Hospital, approximately 25 miles away. In September 2004, Vesom accepted an offer to practice at a hospital in Poplar Bluff, Missouri.

Dr. Vesom filed this action against the Hospital and Drs. Thomas, Goracke and Swayze. Dr. Vesom claims these doctors conspired to deny him privileges and preclude him from practicing in the community because he is Asian and he had reported incidents of professional incompetence committed by other doctors. He asserted discrimination under 42 U.S.C. §§ 1981 and 1985, and Title VI of the Civil Rights Act of 1964. He also claimed violations under the Sherman Act, Kansas public policy (whistle-blowing) and intentional interference with business relationships. The district court granted summary judgment on all claims.

On appeal, Vesom raises numerous issues. As to his claims of racial

discrimination, he contends the district court erroneously determined the Hospital Bylaws did not create a contract and there was no factual issue whether the Hospital's stated reasons for its actions were pretextual. In large part, he maintains the court's ruling on pretext was due to the court's arbitrary evidentiary rulings. He further contends the district court erred in granting summary judgment on his Sherman Act claim, and his state law whistle-blower and interference with business relationship claims. Finally, he argues the waiver contained in his renewal packet did not preclude his lawsuit.

## II. DISCUSSION

We review the district court's grant of summary judgment de novo. *See Stover,* 382 F.3d at 1070. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In conducting our analysis, we view all of the facts and draw all reasonable inferences from the record in favor of the non-moving party. *See Stover,* 382 F.3d at 1070.

A. Evidentiary Rulings

Dr. Vesom claims the district court failed to recognize the existence of a material issue of fact due to its refusal to consider important admissible evidence. Accordingly, we begin with the evidentiary challenges. "Evidentiary rulings are

-10-

committed to the discretion of the trial court, and we review them only for abuse of discretion. Our review is even more deferential where the evidentiary ruling concerns the admissibility of what is claimed to be hearsay evidence." *United States v. Ramirez*, 479 F.3d 1229, 1245 (10th Cir. 2007), *cert. denied*, 128 S.Ct. 1074 (2008). "Under this standard, a trial court's decision will not be reversed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Allen v. Sybase, Inc.*, 468 F.3d 642, 659 (10th Cir. 2006).

1.    Affidavits

Vesom claims the district court erred in failing to consider statements contained in the affidavits of Dr. Ware, Dr. Rider, Nurse Kathy Jackson and Rosetta Birch, a former respiratory therapist. The court disregarded parts of Ware and Rider's affidavits because the statements were based on inadmissable hearsay or conclusory statements about the feelings and intent of others. It struck the affidavits of Birch and Jackson because Vesom failed to disclose these witnesses until just before his response to the summary judgment motion and offered no justification for the delay.

a.    *Affidavits of Rosetta Birch and Kathy Jackson*

Rosetta Birch is a former respiratory therapist and medical records clerk at the Hospital. Her affidavit was signed on January 13, 2006, shortly before Vesom's response to the Hospital's motion for summary judgment. One of the

-11-

instances of Vesom's disruptive conduct involved an allegation that Birch had complained about Dr. Vesom's treatment of a certain patient. Her affidavit contradicted the allegation. In addition, Birch stated she never saw Dr. Vesom "disrupt the flow of care to a patient." (R. Vol. III at 1299.) Her affidavit also stated that on more than one occasion Birch heard the Hospital's Risk Management Officer remark that Dr. Vesom "needs to just go back to where he came from." (*Id.*)

Kathy Jackson, a registered nurse at the Hospital from 1969 until September 28, 2005, signed her affidavit on January 6, 2006. During her last sixteen years at the Hospital, Jackson was the head nurse in the emergency room. She stated certain doctors did not "appreciate[] constructive criticism and often retaliated against those who critiqued hospital procedures or standards" and, contrary to some of the complaints regarding Vesom's behavior to the emergency room staff, she never found him to be abusive or disruptive in the way he handled a situation. (*Id.* at 1301.)

In its reply brief, the Hospital urged the district court to strike these affidavits because neither witness was disclosed in Vesom's original or amended witness lists as required by Fed. R. Civ. P. 26(a)(1) & (e)(1). Rule 37 states a party may not use such evidence unless there is "substantial justification" and the failure to disclose is harmless. Fed. R. Civ. P. 37. According to the district court, the witnesses and their testimony were known to Vesom and "it was

-12-

feasible . . . to disclose . . . these . . . witnesses some time prior" to his summary judgment response. (Vol. I at 423.) Because there was no substantial justification and the witnesses were being used to defeat summary judgment, it struck the affidavits.

The exclusion of evidence presented out of time is "automatic and mandatory" unless the violation was either justified or harmless. *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996). Vesom admits the affidavits were submitted outside the discovery time line and he did not seek to amend his earlier disclosures. Nonetheless, he claims the court erred because the witnesses (at least, Kathy Jackson) were working at the Hospital during much of the discovery phase and were only "willing to come forward and testify" after the discovery deadline had passed. (Appellant's Br. at 35.) He also claims the failure to disclose was harmless because the Hospital could have deposed the witnesses before the reply brief deadline. Vesom complains the district court "elevat[ed] schedules and timetables over the duty to see that justice is done." (Appellant's Reply Br. at 10.) We disagree.

Birch and Jackson were no longer employed by the Hospital for at least three months before their affidavits were signed. There was sufficient time, prior to filing his summary judgment response, to amend earlier disclosures explaining the delay. Instead, Dr. Vesom chose to sandbag. He submitted the affidavits of two new and unannounced witnesses who were available at the time of his Fair

-13-

Hearing, in an attempt to defeat summary judgment. He offers nothing to support his speculation that these witnesses were not willing to come forward until some time in 2005. Even if true, Dr. Vesom knew they had knowledge of material facts long before then. The admissibility of the affidavits under Rule 56(e) does not remove them from the district court's sound discretion to impose sanctions under Rule 37(c). The district court did not abuse its discretion.

### b. *Affidavits of Dr. Rider and Dr. Ware*

The Hospital requested the court strike the affidavits of Drs. Rider and Ware to the extent the declarations were not based on personal knowledge, contained inadmissible hearsay or were merely conclusory statements. The district court granted the motion. Dr. Vesom contends the court misapplied Rule 701 of the Federal Rules of Evidence which permits testimony characterizing the behavior of other members of the MEC as "angry," "hostile" or "retaliatory." *See United States v. Welch*, 745 F.2d 614, 617-18 (10th Cir. 1984) (allowing lay opinion defendant was angry but appeared lucid).

### i) Dr. Rider's Testimony

Dr. Rider's testimony was presented in two affidavits and his deposition.[7] Dr. Rider's testimony recounts his attendance as the at-large member of the MEC committee meetings in January and February 2003. He states the other MEC

---

[7] Dr. Rider's deposition was taken on March 29, 2005. He submitted affidavits on August 30, 2004, and January 12, 2006.

members were "angry" with Dr. Vesom. However, Rider goes further, stating the doctors were angry because Dr. Vesom had voted for an outside peer review of Dr. Thomas' treatment of a patient and at a later meeting, disputed the peer review's accuracy. Rider also stated the MEC members were angry with Vesom's discussions with Bourne and his letter to the Board concerning the inadequate practices at the Hospital. While Dr. Rider was certainly in a position to observe what he believed to be angry behavior, he does not recount any specific statements that would support his conclusion as to *the reason* for the other members' anger.

In his second declaration, Rider stated the committee members did not discuss specific instances of behavior supporting a conclusion that Dr. Vesom was disruptive prior to the decision to recommend non-renewal. Rather, the determination that Vesom's privileges would not be renewed was a foregone conclusion, bolstered by the Hospital attorney's counsel to the members that their decision could be justified in terms of Bylaw violations. The list of Bylaw violations and the exhibits from Vesom's credential files used at the Fair Hearing were compiled by the Hospital's attorney only after the decision to deny a renewal of Vesom's privileges. The district court considered this testimony.

Dr. Rider concluded, however, "The animus directed at Dr. Vesom by members of the MEC was not the result of disruptive behavior on his part. Rather, it was the result of professional jealousy of a better qualified foreign born

doctor whose competition and demanding standards of care were resented by the hospital employed medical staff doctors." (*Id.* at 1296.) Again, he offers no personal observation of specific statements or conduct by the members to support his opinion.

"Under Fed. R. Evid. 701, the testimony of a lay witness in the form of opinions or inferences is admissible if those opinions or inferences are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." *Gossett v. Okla. ex. rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1179 (10th Cir. 2001) (quotations omitted). In *Gossett*, we reversed the district court's rejection of an affidavit which included the opinion of a University instructor that a student was the victim of gender discrimination. We determined the opinion was admissible because:

> [The] affidavit demonstrate[d] . . . her position as an instructor in the Nursing School and on the Admissions Committee provided her with the opportunity to observe firsthand for several years the School's policies and practices with respect to its treatment of male students. Her opinion was a means of conveying her impression based on what she had herself perceived, and it was predicated upon concrete facts within her own observation and recollection.

*Id.* at 1180.

While Dr. Rider personally witnessed the actions of the MEC and may have formed an opinion from his observations, the district court properly excluded his ultimate opinion – that the decision was based, at least in part, on Vesom's place

-16-

of birth.

We need not decide if this evidence is inadmissible because it violated Rule 701.  Rather, Rider's second affidavit directly contradicts his previous deposition statements under oath.[8]  While an affidavit will not be disregarded merely because it conflicts with a prior sworn statement, it deserves no consideration when it "constitutes an attempt to create a sham fact issue."  *Burns v. Bd. of County Comm'rs of Jackson County, Kan.*, 330 F.3d 1275, 1282 (10th Cir. 2003).

To determine whether an affidavit is a sham, we consider "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain."  *Id*.  Dr. Rider's deposition was taken on March 29, 2005.  He testified in detail regarding the ongoing animosity between the hospital-employed physicians (Thomas, Goracke and Swayze) and the independent physicians (Ware, Rider, Arkom, Growney and Vesom).  When asked how Dr. Ware's termination (a non-minority) supported Dr. Vesom's claim of racial discrimination, Dr. Rider responded:

---

[8] "[I]t is consistently held that an order or judgment which is correct in ultimate effect will not be disturbed on appeal even though the lower tribunal relied upon a wrong ground or gave an untenable reason for its action.  The issue on appeal is the correctness in ultimate effect of an order or judgment, not the reason or reasons given therefor by the trial court."  *First Nat'l Bank v. Luther*, 217 F.2d 262, 266 (10th Cir. 1954).

-17-

"Well, as I say, I think Dr. Vesom's case is -- there may be some element that may be related to race, but I would consider that a small consideration." (R. Vol. III at 1059.) When later pressed with the question: "So you would agree . . . that race did not play a part in the decision to recommend non-reappointment of Vesom's medical staff privileges," Rider responded: "I really don't have enough information of the thinking of the other members of the staff to make a statement one way or another." (*Id*. at 1063.)

Rider's declaration in response to the Hospital's motion for summary judgment was signed on January 12, 2006. It does not purport to clear up any confusion during the deposition nor does it claim Rider was exposed to new evidence. Therefore, the declaration should be disregarded as a sham or because, as he testified in his deposition, it was not based on Rider's personal knowledge.

### ii) Dr. Ware's Testimony

Dr. Ware's declaration was executed on January 12, 2006. The district court struck paragraphs "2, 3, 4, 5, 7 and 8" as hearsay and Dr. Ware's "opinions about the feelings and attitudes of certain physicians towards plaintiff." (R. Vol. I at 424.) Vesom maintains the alleged hearsay statements were admissible as the admissions of party-opponents and Dr. Ware's lay opinion was admissible under Rule 701.

Dr. Ware's declaration states he was recruited to Atchison in July 2002. He recounts an incident shortly after his recruitment where Dr. Bourne gave

-18-

Ware a tour of the facility. During the tour, Bourne identified Dr. Vesom and stated: "Watch out for him. He'll stab you in the back!" (R. Vol. III at 1306.) Shortly thereafter, defendant Dr. Thomas told Ware he "hated" Dr. Vesom and "it was no secret." (*Id.*) While golfing with defendant Dr. Goracke, Ware testified Goracke "made disparaging remarks about Dr. Vesom." (*Id.*) Dr. Ware opined that "the feelings and attitudes expressed against Dr. Vesom were, in part, based upon the fact that he was a foreign born doctor coupled with his standard of providing high quality care to his patients."[9] (*Id.*)

We agree the statements of Goracke and Thomas are admissible as the admissions of a party-opponent. Rule 801(d)(2)(A) of the Federal Rules of Evidence provides: "A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . the party's own statement, in either his individual or a representative capacity . . . ." But the remainder of Dr. Ware's statements are hearsay. Like Dr. Rider, Dr. Ware fails to present personally observed statements or conduct as the basis for his opinion. Therefore, the district court did not err in excluding this evidence.

2.      Documentary Evidence

Vesom maintains the district court erred in refusing to admit documents

---

[9] Ware also stated the Hospital was aware of Vesom's complaints to Kansas health authorities because Ware made comments to various hospital personnel, including Dr. Goracke, prior to the February 2003 MEC meeting, regarding both he and Vesom's intentions to report their complaints outside the Hospital. The district court did not strike this testimony.

from his Credential Files for lack of proper authentication. Vesom contends this evidence was admissible on summary judgment because the content of the material would be admissible at trial. *Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1203 n.1 (10th Cir. 2000). Further, the parties had stipulated in a pre-trial order that the documents contained in Vesom's Credential Files were business records and could be introduced without further foundation.

As an initial matter, Vesom has failed to point us to the specific documents he believes were erroneously disregarded by the district court. While the record reveals the Hospital did request specific documents be disregarded, not all of those documents have been included in the record. The documents which are available are handwritten or contain handwritten notes – none identify the author. Given this record, we cannot say the district court abused its discretion in failing to consider the pages we have viewed. *See United States v. McClatchey*, 217 F.3d 823, 835-36 (10th Cir. 2000) (to the extent defendant did not cite to the specific evidence in the record, the issue was waived).

In sum, the district court did not abuse its discretion in striking the affidavits of Rosetta Birch and Kathy Jackson. The affidavits of Drs. Ware and Rider regarding their subjective beliefs as to the intent, thoughts or motivations of others were correctly stricken. To the extent the district court disregarded testimony stating certain persons were physically observed to be "angry" or the statements of party-opponents, we will consider such evidence on appeal.

-20-

B. Racial Discrimination Claims

When the plaintiff bringing a claim under § 1981[10] and Title VI[11] offers no direct evidence of discrimination, we apply the burden-shifting scheme of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).[12] *See Antonio v. Sygma Network, Inc.,* 458 F.3d at 1177, 1181 (10th Cir. 2006). "Under *McDonnell Douglas,* if the plaintiff can establish a prima facie case of discrimination or retaliation, the burden shifts to the defendant to show a legitimate non-discriminatory or non-retaliatory reason for the adverse employment action."

---

[10] 42 U.S.C. § 1981 provides in relevant part:
(a) . . . All persons . . . shall have the same right in every State . . . to make and enforce contracts . . . .
(b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

To establish a prima facie case, the plaintiff must show "(1) that the plaintiff is a member of a protected class; (2) that the defendant had the intent to discriminate on the basis of race; and (3) that the discrimination interfered with a protected activity as defined in § 1981." *Hampton v. Dillard's Dept. Stores, Inc.*, 247 F.3d 1091, 1102 (10th Cir. 2004).

[11] Title VI, codified at 42 U.S.C. § 2000d states, "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

[12] We recognize this is not an "employment" action and the parties agree Dr. Vesom's status with the Hospital was as an independent contractor. However, courts routinely follow the *McDonnell Douglas* model when considering claims of racial discrimination brought by non-employees or independent contractors. *See Hampton*, 247 F.3d at 1107 (non-employee).

*Id.* "If the defendant meets this burden, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason is pretext." *Id.*

Dr. Vesom claims the district court wrongly rejected his claim that the Hospital Bylaws created a contractual interest sufficient to support Vesom's § 1981 claim. The Kansas Supreme Court has not decided the question whether hospital bylaws create a contract and those states which have decided the issue are in disagreement.[13] Fortunately, we need not reach this issue of first impression. Assuming for the purposes of this case the Hospital Bylaws created a contract sufficient to support Dr. Vesom's § 1981 claim, and also assuming he has established a prima facie case under both § 1981 and Title VI, he fails to establish the Hospital's proffered reason for its actions was a pretext disguising a racially discriminatory animus.

C. <u>Pretext</u>

---

[13] Compare *Van v. Anderson*, 66 Fed. Appx. 524, *1 (5th Cir. 2003) (unpublished) ("[S]ection 1981 claims, breach of contract claims, and tortious interference claims all fail as a matter of law. . . . [N]either the medical staff bylaws nor his business relationship with his patients could constitute a contractual relationship upon which liability could be predicated."); *Madsen v. Audrain Health Care, Inc.*, 297 F.3d 694, 699 (8th Cir. 2002) (Missouri courts have held that "hospital bylaws cannot be considered a contract under Missouri law because consideration is lacking."), with *Samuel v. Herrick Mem'l Hosp.*, 201 F.3d 830, 835 n.1 (6th Cir. 2000) (Florida has . . . legislat[ed] that a hospital must promulgate bylaws and those bylaws create a binding contract between the physician and the hospital."); *Marrese v. Deaconess Hosp.*, 966 F.2d 1456, *6 n.8 (7th Cir. 1992) (unpublished) ("[T]he Indiana courts, . . . have recognized that hospital medical staff bylaws can constitute a contract between the hospital and its medical staff.").

Under Tenth Circuit precedent, pretext may be shown by "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted). A plaintiff can make a showing of pretext with evidence that the defendant's stated reason for termination was false. *Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1230 (10th Cir. 2000). Evidence tending to show pretext permits an inference that the employer acted for discriminatory reasons. *Morgan,* 108 F.3d at 1323. At the summary judgment stage, if a plaintiff advances evidence establishing a prima facie case and evidence upon which a factfinder could conclude that the defendant's alleged nondiscriminatory reasons for the employment decisions are pretextual, the case should go to the factfinder. *Id.* "We do not always require actual evidence of discrimination because, '[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. . . . Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.'" *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1168 (10th

Cir. 2007) (quoting *Reeves v. Sanderson Plumbing Prod. Inc.,* 530 U.S. 133, 147

(2002)).[14] "However, it is not *always* permissible for the factfinder to infer

discrimination from evidence that the employer's explanation is unworthy of

belief." *Id.* "'[I]f the record conclusively revealed some other, nondiscriminatory

reason for the employer's [adverse employment] decision, or if the plaintiff

created only a weak issue of fact as to whether the employer's reason was untrue

and there was abundant and uncontroverted independent evidence that no

discrimination had occurred,' the fact that the employer's explanation was

unworthy of belief would no longer be sufficient to create an inference of

discrimination." *Id.* (quoting *Reeves*, 530 U.S. at 148).

Dr. Vesom finds it "incredible" that the district court found evidence of a

post hoc justification for the denial of his reappointment, yet failed to deny

summary judgment. He argues this finding, alone, permits an inference that the

stated reason for termination "is plainly false and pretextual and ample evidence

of mendacity." (Appellant's Br. at 34.) His argument misapprehends his burden.

While Dr. Rider's testimony states the four other members of the MEC decided to

recommend denial of Vesom's renewal application before they reviewed the

Bylaws, Dr. Vesom failed to present any evidence this decision was motivated by

---

[14] Although *Reeves* spoke in terms of judgment as a matter of law under Fed. R. Civ. P. 50, "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" *Reeves,* 530 U.S. at 150 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986)).

racial animus. *See Patel v. Midland Mem'l Hosp. & Med. Ctr.*, 298 F.3d 333, 342 (5th Cir. 2002) ("More importantly, even if Dr. Patel could connect these events to his 1999 suspension, he still fails to create a question of fact for the jury that *race* motivated his suspension.").

In *Reeves*, the Supreme Court determined the defendants were not entitled to judgment as a matter of law because "in addition to establishing a prima facie case of discrimination and creating a jury issue as to the falsity of the employer's explanation, petitioner introduced additional evidence that [the employer] was motivated by age-based animus and was principally responsible for petitioner's firing." *Reeves*, 530 U.S. at 151. Dr. Vesom's claims fail on both factors.[15]

---

[15] The district court concluded (albeit in the context of Dr. Vesom's Sherman Act claim), the Board independently made the ultimate determination to deny a renewal of Vesom's privileges and there was no evidence suggesting the Board did not act independently in accepting the MEC's recommendation after the Fair Hearing procedure was completed. On appeal, Vesom responds by stating, "[t]here is significant evidence that the Fair Hearing Panel and the Board of Directors exercised no real authority over the determination to terminate Vesom; rather, they acted perfunctorily," citing generally to *EEOC v. BCI Coca Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484-86 (10th Cir. 2006), *cert. granted*, 127 S.Ct. 852 and *dismissed* 127 S.Ct. 1931 (2007). (Appellant's Br. at 45.) This issue was not raised in the racial discrimination context below. However, we stated in *BCI*:

> [B]ecause a plaintiff must demonstrate that the actions of the biased subordinate caused the employment action, an employer can avoid liability by conducting an independent investigation of the allegations against an employee. In that event, the employer has taken care not to rely exclusively on the say-so of the biased subordinate, and the causal link is defeated. Indeed, under our precedent, simply asking an employee for his version of events may defeat the inference that an employment decision was racially

"[W]hen a plaintiff's evidence supports a nondiscriminatory motive for the employer's action and the plaintiff presents no evidence to undermine that motive, summary judgment for the employer is appropriate." *Swackhammer*, 493 F.3d at 1168. Dr. Vesom unquestionably established he was disliked, even hated, by other members of the medical staff and members of the MEC. He also established his renewal application was rejected shortly after he and two other physicians (one Caucasian male and one Palestinian male) complained about the peer review procedures at the Hospital. It is also undisputed that both Dr. Vesom and the Caucasian physician were denied renewal of their privileges. The reasons given to both physicians for the MEC's actions were identical.

Dr. Vesom claims "virtually all of the alleged disruptive activity of Dr. Vesom centered on his attempts to improve the quality of health care at the Hospital, or his complaints that he was being discriminated against because of his race by the Hospital administration." (Appellant's Br. at 44.) While Dr. Vesom may believe his race was a factor, he has not come forth with any evidence of his

---

> discriminatory. Employers therefore have a powerful incentive to hear both sides of the story before taking an adverse employment action against a member of a protected class.

*Id.* at 488 (citation omitted). It is undisputed the Board made its decision only after five independent physicians (not associated with the Hospital) heard arguments and received evidence from Dr. Vesom, through his attorney, at the Fair Hearing. Vesom fails to offers any reason why the causal chain was not broken at this point.

allegation. Indeed, the only evidence of the MEC's motivations reveals an ongoing and escalating animosity between the independent physicians (including Dr. Vesom) and physicians employed by the Hospital. Because Dr. Vesom failed to submit any admissible evidence of racial discrimination, the district court appropriately granted summary judgment in favor of the Hospital.

D. Sherman Act Claim

Section 1 of the Sherman Act states:

> Every contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony . . . .

15 U.S.C. § 1. To succeed on a Sherman Act claim, a plaintiff must show concerted action and an unreasonable restraint of trade. *Systemcare, Inc. v. Wang Labs. Corp.*, 117 F.3d 1137, 1139 (10th Cir. 1997). An antitrust injury must be analyzed from the consumer's viewpoint. *Mathews v. Lancaster Gen'l. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996). Thus, Dr. Vesom needs to show the Hospital's conduct "affected the prices, quantity or quality of goods or services, not just his own welfare." *Id.*; *see also Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994). The district court concluded, *inter alia*, Dr. Vesom failed to submit evidence of any anti-trust injury. There was no evidence he had exclusive contracts with his patients or that the Board's decision drove up

prices of cardiology service to any patient.

Vesom claims the court's ruling must be reversed because he was denied staff privileges for "the purpose of diminishing the competition for services in the Atchison community." (Appellant's Br. at 45.) However, he fails to cite to record evidence apart from asserting Dr. Rider's testimony established the defendants' "concerted actions produced an anti-competitive effect." (*Id.* at 46.) Assuming these assertions are sufficient to avoid waiving this issue on appeal, they are not enough to establish any error in the court's ruling.

E.  Kansas Whistle-Blower Claim

Dr. Vesom claims the district court erred in concluding his status, akin to an independent contractor, precluded his public policy claim against the Hospital under the Kansas whistle-blower law. "When the federal courts are called upon to interpret state law, the federal court must look to the rulings of the highest state court, and, if no such rulings exist, must endeavor to predict how that high court would rule." *Stickley v. State Farm Mut. Auto. Ins. Co.*, 505 F.3d 1070,1077 (10th Cir. 2007) (quotation omitted). The Kansas whistle-blower statute provides as follows:

> (a) No employer shall discharge or otherwise discriminate against
> any employee for making any report pursuant to K.S.A. 65-4923[16] or

---

[16]  Kan. Stat. Ann. § 65-4923(a) provides in relevant part:

If a health care provider, or a medical care facility agent or employee
who is directly involved in the delivery of health care services, has

-28-

65-4924.

> (b) Any employer who violates the provisions of subsection (a) shall be liable to the aggrieved employee for damages for any wages or other benefits lost due to the discharge or discrimination plus a civil penalty in an amount not exceeding the amount of such damages. Such damages and civil penalty shall be recoverable in an individual action brought by the aggrieved employee. If the aggrieved employee substantially prevails on any of the allegations contained in the pleadings in an action allowed by this section, the court, in its discretion, may allow the employee reasonable attorney fees as part of the costs.

Kan. Stat. Ann. § 65-4928. The Kansas Supreme court has authorized a whistle-blower action in tort by an at-will employee for retaliatory termination. *See Palmer v. Brown*, 752 P.2d 685 (Kan. 1988). Its rationale for this extension was based in part on public policy grounds. *See id.* at 687-90. The Kansas Supreme court has not addressed whether the statute covers an independent contractor.

Dr. Vesom contends the termination of his staff privileges was based, at least in part, on his complaints to the Board and the Kansas Health Department regarding the Hospital's peer review procedures and professional incompetence of certain doctors. He concedes *Palmer* and the Kansas statutory protections do not reference the status of an independent contractor. However, he urges we apply *Board of County Commissioners, Waubansee County, Kansas v. Umbehr*, which teaches that an independent contractor's entitlement to public policy protections

---

> knowledge that a health care provider has committed a reportable incident, such health care provider, agent or employee shall report such knowledge . . . .

must be resolved in the context of surrounding facts. 518 U.S. 668, 678-81 (1996) (bright-line rule distinguishing between employees and independent contractors leaves Constitutional rights unduly dependant on how the service provider's title is labeled). Dr. Vesom asserts a physician's economic reliance on his relationship with the Hospital constitutes a fact pattern demonstrating an entitlement to whistle-blower protection under public policy considerations and Kansas common law. We decline Vesom's invitation to create state law for Kansas.

The Kansas whistle-blower statute is plain and unambiguous. It clearly provides a medical provider's protection from retaliation by its employer. The plain language does not include independent contractors. Thus, the district court properly refused to extend that protection outside its legislative boundaries. *See Graham v. Dokter Trucking Grp.*, 161 P.3d 695, 703 (Kan. 2007) ("[P]ublic policy is usually the arena of the legislative branch."); *Higgins v. Abilene Mach., Inc.,* 172 P.3d 1201, 1204 (Kan. App. 2007) (issue of public policy is for the legislature to consider in the form of an unambiguous statute); *Palmer*, 752 P.2d at 687-88 ("Before courts are justified in declaring the existence of public policy, . . . it should be so thoroughly established as a state of public mind so united and so definite and fixed that its existence is not subject to any substantial doubt.") (quotation omitted). Dr. Vesom does not allege a constitutional violation as was the case in *Waubansee*. He fails to explain why Supreme Court precedent should

-30-

control a state common law claim or why a federal court should expand state law based on public policy, despite the presence of an unambiguous state statute. While, in the future, Dr. Vesom may be able to persuade the Kansas legislature to modify the existing statutes, it is not our place to create new law for the Kansas legislature or its state courts.

F.  Intentional Interference Claim

Kansas recognizes a cause of action for tortious interference with a prospective business advantage or relationship. *Turner v. Halliburton Co.*, 722 P.2d 1106, 1115 (Kan. 1986).  "The requirements for this tort [are]: (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct." *Id.* (internal citations omitted).  Tortious interference with contractual expectations or a prospective business advantage are predicated on malicious conduct by the defendant and "is aimed at . . . protecting future or potential contractual relations." *Id.*

Vesom complains the district court ruled against him on his interference claim, even though "the termination of his medical staff privileges interfered with his business relations with the thousands of patients he had treated in the 20+

years he practiced in Atchison." (Appellant's Br. at 51.) However, Dr. Vesom does not address the reason the district court ruled against him – he failed to submit actual evidence of interference besides his own conclusory statements. Vesom presented no contractual relationship or exclusive arrangement with his patients on which to base his prospective loss. He proffered no affidavit identifying one person who did not engage Dr. Vesom due to his loss of privileges at the Hospital. On the other hand, the Association came forward with undisputed evidence that Vesom continued to exercise his staff privileges at the Hospital until April 2004, when the Board accepted the MEC's recommendation. It is also undisputed that, after he left Atchison, Dr. Vesom maintained privileges at Cushing Memorial Hospital in Leavenworth, Kansas (approximately 25 miles from Atchison), and Horton Community Hospital in Horton, Kansas (approximately 20 miles from Atchison). He admittedly continued to see patients at Cushing until his voluntary resignation of his privileges at both hospitals to start a practice in Poplar Bluff, Missouri.

Because Dr. Vesom bears the burden of persuasion regarding his damages at trial, the Association "need not negate [Vesom's] claim." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007). Rather, the Association need only "point[] out to the court a lack of evidence on an essential element of [Vesom's] claim." *Id.* The Association has done so. Vesom must respond with "specific facts" from which a rational trier of fact could find in his favor. *Id.*

"[T]he facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

On appeal, Vesom makes no attempt to meet this burden. His argument to the district court was equally unambitious. He argued, "[p]lainly, plaintiff had a thriving medical practice which was destroyed by defendants' intentional and unlawful misconduct." (R. Vol. I at 355.) This statement is not followed by record cites. Moreover, Vesom's affidavit statement gives no indication that he has suffered damages. Indeed, there is some evidence in the record demonstrating his new practice in Missouri may be far more lucrative than his Kansas practice. Dr. Vesom's "[c]onclusory allegations . . . do not establish an issue of fact under Rule 56." *Bruner v. Baker*, 506 F.3d 1021, 1025 (10th Cir. 2007). The district court properly granted summary judgment on this claim.

### III.  CONCLUSION

Because there is no pretext, Dr. Vesom's § 1981 racial discrimination claim fails. With the demise of his § 1981 claim, his § 1985(3) conspiracy claim cannot stand. Dr. Vesom's failure to present any facts supporting damages requires summary judgment be granted in favor of the Association on his Sherman Act claim and his state claim for interference with prospective business relations. We decline to extend or modify Kansas law on public policy grounds, eliminating Dr. Vesom's state whistle-blower claim. Having sufficiently sifted through state law in concluding summary judgment is appropriate on all claims, we need not

address Dr. Vesom's waiver under Kansas law.

**AFFIRMED.**

ENTERED FOR THE COURT

Terrence L. O'Brien
Circuit Judge